# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>**Plaintiff,**<br><br>-against-<br><br>ROBERT J. MUELLER, DEEPROOT FUNDS LLC (a/k/a dprt Funds, LLC), AND POLICY SERVICES INC.,<br><br>**Defendants,**<br><br>-and-<br><br>DEEPROOT TECH LLC, DEEPROOT PINBALL LLC, DEEPROOT STUDIOS LLC, DEEPROOT SPORTS & ENTERTAINMENT LLC, DEEPROOT RE 12621 SILICON DR LLC, AND ROBERT J. MUELLER, JEFFREY L. MUELLER, AND BELINDA G. BREEN, AS CO-TRUSTEES OF THE MB HALE OHANA REVOCABLE TRUST,<br><br>**Relief Defendants.** | Civil Action No.:  5:21-cv-785<br><br>**JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

Plaintiff Securities and Exchange Commission ("Commission"), alleges as follows against Defendants Robert J. Mueller ("Mueller"), deeproot Funds, LLC (a/k/a dprt Funds) ("deeproot"), and Policy Services, Inc. ("Policy Services") (collectively, "Defendants"), and deeproot Tech LLC ("deeproot Tech"), deeproot Pinball LLC ("deeproot Pinball"), deeproot Studios LLC ("deeproot Studios"), deeproot Sports & Entertainment LLC ("deeproot Sports"), deeproot RE 12621 Silicon Dr. LLC ("deeproot Silicon"), and each of Mueller, Jeffrey L. Mueller ("Jeffrey Mueller") and Belinda G. Breen ("Breen") in their respective capacities as co-Trustees of the MB Hale Ohana Revocable Trust (collectively, "Relief Defendants"):

## SUMMARY

1. From at least September 2015 to at least February 2021, Robert J. Mueller and deeproot, both investment advisers, defrauded two investment funds they advise and nearly 300 people who invested roughly $58 million in the funds.

2. Mueller and deeproot were investment advisers to two pooled investment funds that Mueller created in 2014, the deeproot 575 Fund, LLC (the "575 Fund") and the deeproot Growth Runs Deep Fund, LLC (the "dGRD Fund") (collectively, "the Funds"). Mueller and deeproot persuaded investors, many of whom were retirees, to cash out annuities and individual retirement accounts they held with other investment companies and invest in the Funds. Mueller and deeproot told investors the Funds would invest in life insurance policies and deeproot-related businesses to provide relatively safe returns to investors.

3. For the 575 Fund, investors committed their principal investment for five years and elected to receive either simple annual interest of 7% per year paid out in a lump sum at the end of the five-year term, or 5% simple annual interest paid out in monthly installments for each of five years (thus, the "5-7-5" in the fund's name). For the dGRD fund, investors committed their principal investment for an undetermined time and were promised that they could receive a potentially larger payout upon the maturity of a life policy investment and based on a complex, first-in, first-out redemption process at an unspecified future point in time.

4. Mueller and deeproot told investors that the 575 Fund would invest "the simple majority of our Fund Assets" in life insurance policies. Though not disclosed until 2019, the 575 Fund purchased interests in life insurance policies indirectly, by investing in the dGRD Fund, which itself would invest "the majority of our Fund Assets" in life insurance policies purchased for the Funds by Mueller's other company, Defendant Policy Services. Mueller and deeproot also

told investors that the 575 Fund would use "less than fifty percent (50%) of the asset portfolio" to make "capital acquisition[s]" in affiliated businesses, including the Relief Defendants.

5. While Defendants raised more than $58 million from investors in the 575 Fund and the dGRD Fund, they commingled the money in deeproot and Policy Services bank accounts and spent less than $10 million to purchase life insurance policies for the Funds. They also purported to include life insurance policies as assets of the Funds that Mueller and Policy Services had purchased for Mueller's earlier investment funds. Notably, Defendants purchased no new insurance policies for the Funds after September 2017, despite raising approximately $43 million for the Funds after that time.

6. Defendants used the vast majority of the Funds' assets – virtually all of which came from investors in the 575 Fund and the dGRD Fund – like a piggy bank to fund Mueller's deeproot-affiliated businesses, the Relief Defendants. Indeed, Mueller funneled more than $30 million of the Funds' assets to the Relief Defendants in non-arms-length transactions whenever he determined the Relief Defendant businesses had expenses that needed to be paid, and he did so without any analysis as to whether such transfers constituted suitable investments for his client Funds. Further, Mueller made these transfers to Relief Defendants without obtaining anything of substance in return for the Funds and without memorializing the transactions in any way.

7. Since 2015, neither the life insurance policies nor the "capital" investments in affiliated businesses have yielded significant revenue or cash flow for Defendants or the Funds. This caused Mueller and Policy Services to default on the purchase of one $10 million face value life insurance policy, losing nearly $3.5 million of the Funds' money in the process. It also caused Mueller and deeproot to make more than $820,000 of Ponzi-like payments to earlier investors in the Funds using money raised from new investors, and make at least $177,000 in payments from money borrowed on a short-term basis using the life insurance policies as collateral.

8.      Despite making statements suggesting he took no compensation from the Funds, Mueller commingled assets of the Funds in deeproot and Policy Services bank accounts and used them to make *ad hoc* salary payments to himself whenever investor money was available, totaling roughly $1.6 million from 2016 through 2020.

9.      Mueller also used more than $1.5 million of the Funds' assets to pay hundreds of personal expenses, including his daughter's private school tuition, vacations with his family, his second wedding, his second divorce, his third wedding, jewelry for both his second and third wives (including engagement rings and wedding bands for both wives), other lifestyle spending for and by his family, and to buy a condominium in Kauai, Hawaii.  When asked by SEC counsel during investigative testimony about his use of the Funds' assets to pay for these personal and family expenses, Mueller asserted his Fifth Amendment right against self-incrimination.

10.     As alleged in this Complaint, Defendants directly or indirectly employed a device, scheme, or artifice to defraud, made untrue statements of material fact or material omissions, and engaged in acts, practices, or courses of business which operate or would operate as a fraud or deceit, in connection with the purchase or sale of securities, and in the offer and sale of securities. As a result, Mueller and deeproot violated Sections 17(a)(1)-(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rules 10b-5(a)-(c) thereunder [17 C.F.R. § 240.10b-5]. Likewise, Policy Services, acting by and through Mueller, violated Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

11.     As alleged in this Complaint, Defendants Mueller and deeproot, both investment advisers, directly or indirectly employed a device, scheme, or artifice to defraud clients or prospective clients; engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients; and otherwise engaged in acts, practices, or a

course of business which were fraudulent, deceptive, or manipulative. Accordingly, Defendants Mueller and deeproot violated Sections 206(1), (2), and (4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-6] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

12. Because the Relief Defendants received proceeds of Defendants' fraudulent conduct without providing consideration in exchange, they have no legitimate claim to such money. Accordingly, Relief Defendants were unjustly enriched and must disgorge their ill-gotten gains resulting from Defendants' violations.

## JURISDICTION AND VENUE

13. This case involves the offer and sale of limited liability company membership interests in the Funds. These membership interests are investment contracts, which are securities under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c]. In addition, Mueller and deeproot are investment advisers to the Funds because, for compensation, they engaged in the business of advising them as to the value of securities or the advisability of investing in, purchasing, or selling securities. Thus, this Court has jurisdiction over this action under Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. § 77t(d) and 77v(a)], Sections 21(d), 21(e) and 27 of the Securities Exchange Act [15 U.S.C. § 78u(d), 78u(e) and 78(aa)], and Section 214(a) of the Advisers Act [15 U.S.C. § 808b-14(a)].

14. Moreover, Defendants, directly and indirectly, made use of the mails or of the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business described in this Complaint. Specifically, among others, Defendants communicated with investors by email and the internet, and they received funds from investors by wire transfer and remitted Ponzi-like "interest payments" by wire transfer.

15. Venue is proper in this District because the Defendants and Relief Defendants reside in, and a substantial part of the events and omissions giving rise to the claims occurred in,

the Western District of Texas, San Antonio Division, including but not limited to the Defendants' sales of securities, misrepresentations, acts, practices, transactions, and courses of business.

## DEFENDANTS

16.     **Robert J. Mueller,** age 46, is a natural person residing in San Antonio, Texas. He graduated from law school in 2000, and is a current member of the State Bar of Texas. At all relevant times, Mueller was an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)] because he was in the business of providing investment advice to clients about securities in exchange for compensation, and he also owned and exclusively managed and controlled deeproot, which was the investment advisor to the 575 Fund and the dGRD Fund. In fact, Mueller is the principal and exclusive control person of all of the deeproot entities, including all of the Defendants and deeproot-affiliated Relief Defendants in this Complaint.

17.     **deeproot Funds LLC (a/k/a dprt Funds, LLC)** is a Texas limited liability company formed by Mueller in 2013 with its principal place of business in San Antonio, Texas. Mueller is the only officer of deeproot and, indirectly, is the only owner of the company. At all relevant times, deeproot was an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)] because it is the investment advisor to the 575 Fund and the dGRD Fund.

18.     **Policy Services Inc.** is an "S" corporation that Mueller formed in Nevada in 2012 and re-domiciled in Texas in 2016. Its principal place of business is in San Antonio, Texas, and Mueller is its sole shareholder. Mueller used Policy Services to purchase and hold life insurance policies for and on behalf of the Funds, and used bank accounts in Policy Services' name, funded almost exclusively with assets of the Funds, to pay significant personal expenses he incurred on credit cards in the names of his other entities.

6

**RELIEF DEFENDANTS**

19.    **deeproot Tech LLC**, a wholly-owned subsidiary of Policy Services, is a Texas limited liability company Mueller formed in March 2015, with its principal place of business in San Antonio, Texas.

20.    **deeproot Pinball LLC**, a wholly-owned subsidiary of deeproot Tech, is a Texas limited liability company Mueller formed in March 2015, with its principal place of business in San Antonio, Texas.

21.    **deeproot Studios LLC**, a wholly-owned subsidiary of Policy Services, is a Texas limited liability company Mueller formed in November 2018, with its principal place of business in San Antonio, Texas.

22.    **deeproot Sports & Entertainment LLC**, a wholly-owned subsidiary of Policy Services, is a Texas limited liability company Mueller formed in April 2017 with its principal place of business in San Antonio, Texas.

23.    **deeproot RE 12621 Silicon Dr. LLC**, a wholly-owned subsidiary of Policy Services, is a Texas limited liability company formed by Mueller in February 2020 with its principal place of business in San Antonio, Texas.

24.    **Robert J. Mueller**, **Jeffrey L. Mueller, and Belinda G. Breen, in their capacities as Co-Trustees of the MB Hale Ohana Revocable Trust ("MBHO Trust")**.  The MBHO Trust is a Texas revocable trust formed in November 2016 that received or maintains proceeds of Defendants' fraudulent conduct and was used by Mueller to purchase a Kauai, Hawaii condominium with such proceeds.

**OTHER RELEVANT ENTITIES**

25.    **deeproot 575 Fund LLC** is a Texas limited liability company that Mueller formed in December 2014, with its principal place of business in San Antonio, Texas.  Mueller,

through and with deeproot, serves as its investment adviser. Neither the 575 Fund nor its securities have been registered with the Commission at any point in time.

26. **deeproot Growth Runs Deep Fund LLC** is a Texas limited liability company that Mueller formed in February 2014, with its principal place of business in San Antonio, Texas. Mueller, through and with deeproot, serves as its investment adviser. Neither the dGRD Fund nor its securities have been registered with the Commission at any point in time.

## FACTS

### I. Mueller and deeproot Created, Solicited Investments in, and Served as Investment Advisers to the Funds

27. Mueller and deeproot formed the dGRD Fund and the 575 Fund as Texas limited liability companies in February 2014 and December 2014, respectively.

28. Mueller had exclusive authority and control over the drafting and dissemination of the private placement memoranda ("PPMs") as well as other marketing materials for both of the Funds.

29. Although there were multiple versions of the PPMs for both Funds, as a general matter, all versions of the PPMs for both Funds disclosed, among other things: (i) the investment strategy and investors' expected returns for both of the Funds; and (ii) that Mueller and deeproot had exclusive control over, and responsibility for, managing the Funds and their investments.

30. As described in the PPMs for both Funds, the investment strategy involved a plan to purchase life insurance policies that insured the lives of people who were not affiliated with Mueller or any of his businesses and who had sold their policies for cash settlements while still alive. By purchasing these policies, the Funds would be entitled to the death benefit of the purchased policies upon maturity – *i.e.*, the face value of the policy upon the death of the insured. At all times, the PPMs stated that Mueller and deeproot would invest a majority of the Funds' assets in life insurance policies. Although not disclosed in the 575 Fund's PPM until 2019,

according to Mueller, the 575 Fund never held any interests in life policies directly, but rather purchased securities issued by the dGRD Fund, which in turn owned the life policies.

31.      All versions of the PPM for the 575 Fund, and some versions of the PPM for the dGRD Fund, disclosed that the Funds, at Mueller and deeproot's discretion and direction, also could make "capital acquisition[s]" (*i.e.*, investments) in deeproot-affiliated businesses. Some of the PPMs specifically named several of the Relief Defendants as affiliates that could receive money from the Funds: *e.g.*, deeproot Tech, deeproot Pinball, deeproot Studios, and deeproot Sports.

32.      Mueller and deeproot told investors that the Funds' investments in the affiliated entities would provide more safety to the Funds' investment portfolios as well as on-going revenue until the life insurance policy investments matured and death benefits were collected.  In the 2019 version of the 575 Fund, for example, investors were told that these affiliate investments, ostensibly, would "i) [] provide short term liquidity; ii) [] provide liquid revenue or distributions to pay off positions sooner and more frequently than waiting on life policy maturities; and iii) [be] safer diversification of underlying assets away from just life policies."

33.      The PPMs did not uniformly describe how the Funds would invest in the deeproot-affiliated businesses or what the Funds would receive in exchange for such investments.  The 2015 and 2019 versions of the PPM for the 575 Fund, and the August 2015 version of the PPM for the dGRD Fund, for example, describe the investments as "a purchase of an internal, affiliated investment position in another enterprise."  The September 2015 version of the PPM for the dGRD Fund, however, describes a specific investment in deeproot Tech and its "sole project," deeproot Pinball, in exchange for Class B Shares of deeproot Pinball.

34.      Regardless of the language applicable at any given time, in practice, the Funds never actually received any ownership or other interests in return for the significant assets of the Funds that Mueller and deeproot funneled to the Relief Defendants. Instead, as explained further

below, Mueller and deeproot used the Funds' assets as a piggy bank of available cash to fund the Relief Defendants' ongoing operations whenever expenses arose.

35. The PPMs also describe the ways in which investors in either of the Funds would obtain investment returns, including certain repayment options ostensibly designed to provide investors with a reliable stream of monthly income. The PPM for the 575 Fund provides that, in addition to receiving a return of their investment principal after five years, investors have the option of either a "deferred" seven percent lump sum annual return or a "periodic" five percent monthly return.

36. Specifically, 575 Fund investors choosing the deferred option ("575D") would receive annual interest of seven percent of their investment principal, non-compounded, paid in a lump sum at the end of five years. Those persons choosing the periodic option ("575P") would receive a return equal to an annual, non-compounded five percent of their investment principal, paid in monthly installments over the course of the five years that their principal was committed.

37. Mueller and deeproot marketed the 575P option as providing steady and relatively large "interest" income to persons in retirement, which Mueller and deeproot appear to have classified as "dividends" at the time the returns actually were paid to investors. About 45% of 575 Fund investors chose this periodic return option.

38. The dGRD Fund operated differently. Mueller and deeproot marketed the dGRD Fund as providing a predetermined rate of return on the life policy investments they referred to as the "liquidation multiplier." For example, in 2019, the liquidation multiplier was set at 52.5% for investment amounts under $750,000 and 65% for amounts over $750,000, meaning a $500,000 investment would be worth $762,500 at the time of liquidation whereas a $1,000,000 investment would be worth $1,650,000. This return and the original principal would be paid to dGRD Fund investors in a lump sum in the sequential order in which they invested, at

unspecified times upon the dGRD Fund's receipt of sufficient profits from a pool of "matured"

life insurance policies.

39.     The 2019 versions of the PPMs for both Funds included a section titled "Principals

& Advisors," which stated "[t]here is only one director and executive officer of the Company:

Robert J. Mueller."  These sections in the 2019 versions of the PPMs are identical – indeed,

presumably because Mueller simply cut-and-pasted it, the 575 Fund's PPM mistakenly refers to

the "dGRD Fund" – and leave no doubt as to Mueller's total control over the Funds since

inception, or how he would be paid by Policy Services for his advisory services to the Funds:

> Mr. Mueller is responsible for deeproot's product design, marketing, and strategic
> planning areas, as well as operation and management of multiple entities.  Robert
> is the architect and implementer of all products, services, or designs Policy
> Services, Inc. or the deeproot® family of companies have marketed or sold.  He has
> also personally managed all aspects of the administrative functions of the
> enterprises, supervised all investor or client care, handled most of the clerical and
> processing of investor or client paperwork, designed the IT systems and client
> portal, and is chiefly responsible for the growth and success of all the enterprises.
> Robert also has backgrounds in accounting, valuation, information technology,
> graphic design, marketing, programming, and other technical areas.

> Robert J. Mueller is the only executive of the Company.  He receives no direct
> compensation from the dGRD Fund.  Robert is paid a salary from the Ultimate
> Parent [Policy Services] for all services provided across all the entities.  Neither he,
> nor any other executive or personnel serving or employed from the Ultimate Parent
> [Policy Services] downwards, may earn a commission on any Preferred Shares
> Sold.  Any marketing or travel expenses on behalf of the dGRD Fund will be
> expensed by invoice.

40.     This was not the only time Mueller cited to Policy Services in the 2019 versions

of the PPMs for both Funds in an effort to convince investors that their assets would be safe in

his care.  In describing some of the risk factors associated with investing in life insurance

policies, Mueller claimed that his use of Policy Services mitigated some of this risk:  "[B]y using

our ultimate parent company, [Policy Services], as our sole affiliated policy administration

provider between us and the insurance carrier, *we are unable to 'raid the piggy bank'.*"

11

(emphasis added). Thus, Mueller falsely informed investors and prospective investors that

deeproot and Policy Services were structured to minimize the opportunity for very kind of fraud

that was actually then occurring.

41. From September 2015 to at least February 2021, Mueller and deeproot raised over

$58 million from investors in both Funds as follows:

| Fund | No. of Investors September 2015 to September 2017 | Amount Invested September 2015 to September 2017 | No. of Investors October 2017 to February 2021 | Amount Invested October 2017 to February 2021 | Total Invested |
|------|------|------|------|------|------|
| The 575 Fund | 38 | $7,512,934 | 177 | $38,662,612 | $46,175,546 |
| The dGRD Fund | 54 | $8,335,369 | 27 | $4,278,844 | $12,614,213 |

42. As contemplated in the PPMs, Mueller and deeproot served as the investment

adviser to the Funds in managing these assets. Mueller, and thus deeproot, devised the

investment strategy on behalf of both Funds, analyzed and made the investments, determined the

content of communications to prospective and actual investors, and exclusively controlled the

bank accounts, investments, and other assets of the Funds.

## IV. Mueller and deeproot Used New Investor Money to Make Ponzi-like Payments to Earlier Investors in the Funds

43. Since the first investor joined the Funds in 2015, the Funds' life insurance

portfolio and the deeproot-affiliated business ventures have yielded less than $1.9 million in total

revenues, before even accounting for costs, to the Funds. Yet, during this same period, Mueller

and deeproot paid over $2.8 million in monthly "returns" to the 575P investors.

12

44.     Bank account records show that at least $820,000 of 575P payments were made to existing investors from money raised from new investor contributions to the Funds, and at least $177,000 being paid from funds that Mueller borrowed on a short-term basis from third parties using assets of the Funds as collateral.

45.     Nothing in the Funds' PPMs or other offering documents would lead reasonable investors in the Funds to expect that 575P payments to investors, or any other payments to the Funds' investors, would be made using money received from new investors in the Funds.

46.     Nothing in the Funds' PPMs or other offering documents would lead reasonable investors in the Funds to expect that 575P payments to investors, or any other payments to the Funds' investors, would be made using borrowed money.

47.     Nothing in the Funds' PPMs or other offering documents would lead reasonable investors in the Funds to expect that Mueller or deeproot would use assets of the Funds as collateral on loans to raise money to make payments to investors.

48.     Mueller engaged in this activity despite knowing that paying earlier investors with new investors' money is a fraudulent Ponzi-like scheme, which he knew from studying a well-publicized Ponzi scheme lawsuit involving investments in life insurance policies.

49.     In or around March 2020, Mueller drafted and issued a document to investors that he titled "deeproot Family of Companies - Investment Portfolio Narrative 2020.B2."  In a section of the document describing the pinball venture, Mueller described why he focused on investments – like deeproot Pinball – instead of just life policies, writing:  "The downfall of these companies (and strategy) wasn't really because of the life policies themselves.  It instead was due to the company's CHOICE of how to deal with the weaknesses.  In nearly every case, the company chose to LEVERAGE (i.e., either borrow capital at high rates on the open marketing [sic], or Ponzi-scheme proceeds) against future maturities." (all caps in original.)

Despite these statements, Mueller was doing exactly what he railed against other companies for doing – making Ponzi-like payments and borrowing money in order to pay "returns" to investors.

50.     When the Funds failed to receive new investor capital between August and November 2020, and with no other revenue coming in to the Funds from the life insurance policy settlements or the affiliated businesses, Mueller and deeproot failed for two months to pay monthly "returns" to most of his 575P investors.

51.     On August 22, 2020, Mueller authored a personal letter to 575P investors – but not the 575D or dGRD investors – claiming that the COVID-19 pandemic "has caused some disruptions to cash flow" and stating, "we try to keep adequate reserves for things like this."

52.     On September 30, 2020, Mueller sent a similar letter to the 575P investors – and, again, to neither the 575D or dGRD investors – citing the COVID-19 pandemic and blaming "cash flow delays in mid to late September" for having "depleted our 575P payment reserves." In reality, bank account records show that neither the Funds nor any of the Defendants had ever maintained cash reserves for the payment of 575P investor returns or for any other purpose.

53.     On November 30, 2020, Mueller resumed monthly payments to 575P investors, not with profits from the Funds' investments, because there were none, but with proceeds from loans that he obtained from third parties using assets of the Funds as collateral.

## V.     Mueller and deeproot Funneled Millions of Dollars of the Funds' Assets to Finance the Relief Defendants' Operations

54.     Despite telling the Funds' investors through the PPMs that both Funds would invest primarily in life insurance policies, Mueller and deeproot have not purchased a single life insurance policy since at least September 2017.  Since that time, however, they have raised approximately $43 million from 575 Fund and dGRD Fund investors and diverted the majority

of it to the Relief Defendants and Mueller's own pockets, contravening the investment allocation strategy of the Funds presented to investors.

55.     Indeed, Mueller spent virtually every dollar he ever obtained from investors, and he often paid business expenses for the Relief Defendants on credit cards in advance, only paying those bills later after receiving new investor funds.  In doing so, Mueller and deeproot breached the fiduciary duties they owed to the Funds in that they did not conduct, or document that they conducted, any analysis in advance of each transfer to determine whether these expenditures were a good or appropriate investment for his client Funds.  Rather, despite their fiduciary obligations, Mueller and deeproot made their *ad hoc* "investment" decisions based on what was best for Mueller and the Relief Defendants at that moment.

56.     Moreover, other than relying on bank records after the fact, Mueller and deeproot did not document these purported investments as they occurred. To this day, despite Mueller pouring tens of millions of the Funds' (and thus investors') dollars into these businesses, the Funds have no documented ownership or other interest in any of the deeproot-affiliated entities.

57.     Reasonable investors would consider it important to their investment decisions that Defendants were not acquiring life insurance policies as promised in the PPMs and were instead solely funneling investor money into providing cash flow for Mueller and his deeproot-affiliated businesses.

58.     Reasonable investors would consider it important to their investment decisions that Defendants, in breach of their fiduciary duties, did not conduct, nor document that they conducted, any analysis to determine if the transfers of the Funds' assets to Relief Defendants were suitable investments for client Funds.

59.     Reasonable investors would consider it important to their investment decisions that Defendants were not documenting or otherwise memorializing the Funds' investments of their money in Mueller's deeproot-affiliated businesses.

60.     Mueller used deeproot and Policy Services bank accounts to make hundreds, if not thousands, of additional payments in support of the deeproot-affiliated businesses, but kept such poor records that any individual payment cannot yet be attributed specifically to one of the Defendants or Relief Defendants.

61.     Mueller and deeproot had no intention of obtaining anything in exchange for the Funds' purported investments. This fact became clear through a March 2017 communication Mueller had with a financial consultant. When the consultant asked Mueller whether there were "debt or investment agreements in place" between the Funds and deeproot Tech, among other businesses, Mueller responded, "there is no formal documentation other than our discretion." When the consultant suggested that Mueller memorialize the transactions, Mueller responded, "I will 'paper' those internally."

62.     Mueller's apparent attempt at "papering" these transactions was an "Investment Allocation Agreement" between deeproot (on behalf of the Funds as well as Mueller's previous investment vehicles) and deeproot Tech. The agreement did not mention any of the other Relief Defendants and was signed by Mueller on behalf of all parties. The agreement provided a "Split of Net Income" that stated the Funds would be entitled to forty percent (40%) of "net quarterly income." In breach of their fiduciary duties, neither Mueller nor deeproot conducted any analysis to determine whether (i) the supposed income split was sufficient consideration for the millions of dollars the Funds had already contributed to deeproot Tech with nothing in return; or (ii) there was a reasonable likelihood that deeproot Tech would ever be able to repay the principal investments, let alone generate a profit.

63.     Moreover, Mueller acknowledged during investigative testimony that there has

never been any "net quarterly income" to split pursuant to this post-facto agreement designed

only to "paper" Mueller and deeproot's misuse of the Fund's assets.

## V.     Mueller, deeproot, and Policy Services Misappropriated Investor Funds for Mueller's Personal Benefit

64.      In addition to "raiding the piggy bank" to manage the deeproot-affiliated

businesses' cash flow, Mueller, directly and through deeproot and Policy Services, raided the

piggy bank to personally enrich himself.

65.     The Funds' PPMs either do not mention Mueller's compensation at all, or

expressly state that Mueller "receives no direct compensation" from the Funds and instead would

be paid by Policy Services for "all services provided across the entities."  In reality, Mueller

commingled all of the Funds' assets in deeproot and Policy Services' bank accounts and then

caused Policy Services to pay him a salary from those assets on an *ad hoc* basis when, and as,

money became available from new investor deposits.  Indeed, between 2015 and 2020, Mueller

paid himself over $1.6 million in salary and other "dividend" payments without any written

compensation agreement or plan in place.

66.     On top of his direct compensation, Mueller used deeproot and Policy Services to

misappropriate approximately $1.5 million from the Funds and the Funds' investors.  Specifically,

Mueller and one of his wives used credit cards in the name of a now-defunct entity he owned to

incur vast personal expenses, which Mueller then paid from bank accounts in Policy Services' name

that he exclusively controls and which were funded almost exclusively with the Funds' assets.

67.     Through this scheme, Mueller paid for, among other things, his child's private

school tuition; personal medical and dental bills; federal income tax payments; vacation cruises;

art purchased from art galleries; personal legal bills relating to his second divorce; jewelry for his

both his second and third wife, including engagement rings and wedding bands for both wives;
and fees associated with his second and third weddings.

68.    Between November 2016 and August 2018, Mueller also spent or transferred
almost $330,000 of investor funds for the benefit of the MB Hale Ohana Revocable Trust, a
Mueller family trust for which Relief Defendants Mueller (in his capacity as co-trustee), his
father Jeffrey L. Mueller, and his stepmother Belinda G. Breen serve as co-trustees.  In
November 2016, he wired $135,000 from a Policy Services bank account to purchase a Kauai,
Hawaii condominium that was titled in the name of the trust.  In March 2017, he paid for
renovations to that property using a check for over $59,000 drawn on deeproot's account.  Then,
in August 2018, he wired an additional $135,000 directly to the trust from Policy Services'
account.

69.    In August and October 2019, Mueller wired an additional $75,000 of the Funds'
assets from a deeproot bank account for season tickets at professional sports arena.

70.    Mueller also transferred an additional $194,000 of the Funds' assets from Policy
Services and deeproot bank accounts directly into his personal bank account between January
2016 and February 2021, and personally withdrew $100,000 in cash in February 2017, without
documenting these uses of the Funds' assets.

71.    When asked by SEC counsel during investigative testimony about his use of the
Funds' assets to pay for personal expenses, Mueller asserted his Fifth Amendment right against
self-incrimination.

## CLAIMS FOR RELIEF

### COUNT I

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]
and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)]
(Defendants Mueller and deeproot)**

72.　　Paragraphs 1 through 71 are re-alleged and incorporated here by reference.

73.　　By engaging in the conduct described above, Defendants Mueller and deeproot directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, knowingly or recklessly made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

74.　　By engaging in the conduct described above, Defendants Mueller and deeproot violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### COUNT II

**Violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)]
(Defendants Mueller and deeproot)**

75.　　Paragraphs 1 through 71 are re-alleged and incorporated here by reference.

76.　　Defendants Mueller and deeproot, by engaging in the conduct above, singly or in concert with others, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

　　　a.　Knowingly, recklessly, or negligently obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary

19

in order to make the statements made, in light of the circumstances under which

they were made, not misleading.

77.     By engaging in the conduct described above, Defendants Mueller and deeproot

violated, and unless restrained and enjoined will continue to violate, Section 17(a)(2) of the

Exchange Act [15 U.S.C. § 77q(a)].

**C<small>OUNT</small> III**

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]**
**and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)]**
**(All Defendants)**

78.     Paragraphs 1 through 71 are re-alleged and incorporated here by reference.

79.     By engaging in the conduct described above, Defendants Mueller, deeproot, and

Policy Services directly or indirectly, singly or in concert with others, in connection with the

purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, or

of the mails, or of the facilities of a national securities exchange, knowingly or recklessly:

    a.   employed devices, schemes, or artifices to defraud; and/or

    b.   engaged in transactions, practices, or courses of business which operated or would

        operate as a fraud or deceit upon the purchaser.

80.     By engaging in the conduct described above, Defendants Mueller, deeproot, and

Policy Services violated, and unless restrained and enjoined will continue to violate, Section

10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R.

§ 240.10b-5(a) and (c)].

<u>C</u>OUNT IV

**Violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)]**
**(All Defendants)**

81.     Paragraphs 1 through 71 are re-alleged and incorporated here by reference.

82.     Defendants Mueller, deeproot, and Policy Services, by engaging in the conduct above, singly or in concert with others, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

a.  Knowingly or recklessly employed a device, scheme, or artifice to defraud, or

b.  Knowingly, recklessly, or negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

83.     By engaging in the conduct described above, Defendants Mueller, deeproot, and Policy Services violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Exchange Act [15 U.S.C. § 77q(a)(1) and (3)].

<u>C</u>OUNT V

**Violation of Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1)-(2)]**
**(Mueller and deeproot)**

84.     Paragraphs 1 through 71 are re-alleged and incorporated here by reference.

85.     At all relevant times, Defendants Mueller and deeproot were "investment advisers" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)].

86.     Defendants Mueller and deeproot (a) while acting knowingly or recklessly, employed devices, schemes, or artifices to defraud clients and prospective clients; and (b) while acting knowingly, recklessly, or negligently, engaged in transactions, practices, and courses of business which operated as a fraud or deceit upon clients and prospective clients.

87.     By reason of the foregoing, Defendants Mueller and deeproot violated Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1)-(2)].

<u>COUNT VI</u>
**Violations of Section 206(4) [15 U.S.C. § 80b-6(4)]**
**and Rule 206(4)-8 of the Advisers Act [17 C.F.R. 275.206(4)-8]**
**(Mueller and deeproot)**

88.     Paragraphs 1 through 71 are re-alleged and incorporated here by reference.

89.     At all relevant times, Defendants Mueller and deeproot were "investment advisers"

within the meaning of the Advisers Act.

90.     By engaging in the conduct described above, Defendants Mueller and deeproot,

directly or indirectly, knowingly or recklessly, by use of the means or instrumentalities of

interstate commerce: (1) made untrue statements of material fact or omitted to state material facts

necessary to make the statements made, in light of the circumstances under which they were

made, not misleading, to investors or prospective investors in the Funds; and (2) otherwise

engaged in acts, practices or courses of business that were fraudulent, deceptive or manipulative

with respect to investors or prospective investors in the Funds.

91.     By reason of the foregoing, Defendants Mueller and deeproot violated Section 206(4)

of the Advisers Act [15 U.S.C. § 80b-6(4)], and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8].

<u>COUNT VII</u>
**Disgorgement of Unjust Enrichment**
**(All Relief Defendants)**

92.  Paragraphs 1 through 71 are re-alleged and incorporated here by reference.

93.  The Relief Defendants received, directly or indirectly, funds or other property

from one or more of the Defendants or the Funds' investors, which are the proceeds of, in

furtherance of, or are traceable to the proceeds of, the unlawful activities alleged in this

Complaint to which the Relief Defendants have no legitimate claim.  As a consequence, the

Relief Defendants have been unjustly enriched.

94.    By reason of the foregoing, it would be inequitable for the Relief Defendants to retain the proceeds resulting from Defendants' violations of the federal securities laws and such proceeds should be disgorged.

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that this Court:

A.    Permanently enjoin Defendants Mueller, deeproot, and Policy Services from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder,

B.    Permanently enjoin Defendants Mueller and deeproot from violating, directly or indirectly, Sections 206(1), 206(2) and 206(4) of the Advisers Act [15 U.S.C. § 80b-6(1),(2), and (4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

C.    Ordering each Defendant and each Relief Defendant to disgorge all ill-gotten gains and/or unjust enrichment received directly or indirectly from the securities law violations alleged herein, with pre-judgment interest thereon, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)];

D.    Order Defendants Mueller, deeproot, and Policy Services to pay a civil penalty in an amount determined by the Court, pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)],   Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)] for the violations alleged herein;

E.    Permanently enjoin Defendant Mueller from, directly or indirectly, including, but not limited to, through any entity owned or controlled by Mueller, participating in the issuance, purchase, offer, or sale of any security, or soliciting existing or potential investors in the purchase

or sale of securities, provided, however, that such injunction shall not prevent Mueller from purchasing or selling securities for his own personal accounts;

F.      Permanently prohibit Defendant Mueller, under Section 20(e) of the Securities Act [15 U.S.C. § 77t(d)(4)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

G.      Order such other relief as this Court may deem just and proper.

### JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Dated:  August 20, 2021                          Respectfully submitted,

                                                 */s/ Christian D. H. Schultz*
                                                 Christian D. H. Schultz (Texas Bar #24072843)
                                                 David Nasse
                                                 SECURITIES AND
                                                 EXCHANGE COMMISSION
                                                 100 F Street, NE
                                                 Washington, DC 20549
                                                 (202) 551-4740 (Schultz)
                                                 (202) 551-4426 (Nasse)
                                                 SchultzC@sec.gov
                                                 NasseD@sec.gov

                                                 *Counsel for Plaintiff*
                                                 *Securities and Exchange Commission*

Of counsel:
George Bagnall
Paul J. Bohr
Eric S. Berelovich
SECURITIES AND
EXCHANGE COMMISSION
100 F Street, NE
Washington, DC 20549