# Exhibit C

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DEEPROOT CAPITAL MANAGEMENT, LLC ET AL.,[1] | § | BANKRUPTCY NO. 21-51523-MMP |
| | § | |
| | § | |
| DEBTORS | § | JOINTLY ADMINISTERED |
| | § | |
| | § | |
| JOHN PATRICK LOWE, | § | |
| CHAPTER 7 TRUSTEE | § | |
| FOR THE BANKRUPTCY ESTATE | § | |
| OF DEEPROOT CAPITAL | § | |
| MANAGEMENT, LLC ET AL., | § | |
| | § | ADV. PROC. NO. _____ |
| PLAINTIFF | § | |
| | § | |
| v. | § | |
| | § | |
| ROBERT J. MUELLER | § | |
| | § | |
| DEFENDANT | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, John Patrick Lowe, Chapter 7 Trustee ("**Plaintiff**" or "**Trustee**") for the jointly

administered Bankruptcy Case of deeproot Capital Management, LLC et al. ("**deeproot**") hereby

---

[1] The administratively consolidated chapter 7 cases, along with their respective case numbers and the last four digits of each Debtor's federal tax identification number, are: In Re: Policy Services, Inc. 21-51513 (2864), In Re: Wizard Mode Media, LLC, 21-51514 (3205), In Re: deeproot Pinball LLC, 21-51515 (0320), In Re: deeproot Growth Runs Deep Fund, LLC, 21-51516 (8046), In Re: deeproot 575 Fund, LLC, 21-51517 (9404), In Re: deeproot 3 Year Bonus Income Debenture Fund, LLC, 21-51518 (7731), In Re: deeproot Bonus Growth 5 Year Debenture Fund, LLC, 21-51519 (9661), In Re: deeproot Tech LLC, 21-51520 (9043), In Re: deeproot Funds LLC, 21-51521 (9404), In Re: deeproot Studios LLC , 21-51522 (6283), and In Re: deeproot Capital Management, LLC, 21-51523 (2638) (collectively, the "**Bankruptcy Cases**").

files this Original Complaint on behalf of all debtor estates, respectfully showing the Court as follows:

## I.  PRELIMINARY STATEMENT

1.      Robert Mueller ("**Mueller**"), a trained lawyer licensed by the State of Texas, was the sole owner and principal of Policy Services, Inc. ("**Policy Services**") and its wholly owned subsidiaries Wizard Mode Media, LLC, deeproot Pinball LLC, deeproot Growth Runs Deep Fund, LLC ("**dGRD Fund**"), deeproot 575 Fund, LLC ("**575 Fund**"), deeproot 3 Year Bonus Income Debenture Fund, LLC, deeproot BonusGrowth 5 Year Debenture Fund, LLC ("5 Year Debenture Fund"), deeproot Tech LLC, deeproot Funds, LLC, deeproot Studios, LLC, and deeproot Capital Management, LLC  (collectively, the "**deeproot Entities**" or "**Debtors**"). Mueller used Policy Services and its subsidiaries to raise approximately $71,000,000 from investors from 2012 through 2021. Almost all of this money was lost to ill-conceived purchases of life insurance policies, investments in unrelated and worthless businesses, payment of unreasonable commissions and finders fees to wealth advisors, insurance agents, and other financial professionals (the "**Finders**"), self-dealing transactions entered into between the Debtors and Mueller and his family members for the purchase of real estate in Hawaii, transfers of money to Mueller, the payment of fictitious profits to investors in order to keep the Ponzi scheme going, and payments to credit card companies for his own personal expenses. A substantial amount of investor money was used to develop a pinball machine manufacturing business which was never properly capitalized and doomed to fail from the start—it was just a ruse.

2.      From 2012 until 2015, Mueller raised money from investors through the sale of "Life Settlements" or fractionalized interests in life insurance policies purchased from their original owners. After investigation, the Trustee believes that twenty four policies were purchased

with a total face value at maturity (death of the insured) of approximately $36,000,000. Mueller, through Policy Services, raised approximately $16,000,000 from investors to purchase these twenty four life insurance policies. Mueller did not place any funds in escrow to pay the ongoing premium obligations owing on these life insurance policies and many of them ultimately lapsed or were sold without notice to the owners of the fractionalized interests. As confirmed by the Texas Supreme Court in the *Life Partners, Inc.*[2] decision, the investment side of a life settlement transaction is the sale of a security under the *Howey* test. None of the life settlement contracts were registered as a securities offering with the Texas State Securities Board or the United States Securities and Exchange Commission ("**SEC**"). [3]

3.    Shortly after the *Life Partners* decision was issued in 2015, Mueller started raising money in the deeproot entities through the sale of bond debentures, which are securities. The debentures in different forms guaranteed an above market return to the purchasers of between 5% and 7%. At the time the debentures were issued the deeproot entities had no means, other than the maturity of a life insurance policy, to pay the guaranteed return. Through the sale of debentures, Mueller raised an additional $55,000,000 from investors. Even making the unreasonable assumption that the total amount of premiums due on the life insurance policies would be paid *and* that the life insurance policies would all mature at the same time generating $36,000,000 in proceeds, Policy Services could never repay all of its investors. In short, Mueller oversold the face value of the life insurance policies owned by Policy Services by a factor of two. Mueller knew or

---

[2] *Life Partners, Inc. v. Arnold*, 464 S.W.3d 660, 667 (Tex. 2015).

[3] On August 20, 2021, a few weeks prior to the filing of the Debtors' bankruptcy cases, the SEC initiated a civil action against Mueller and several of his entities for violations of federal securities laws, styled as *Securities and Exchange Commission v. Robert J. Mueller et al.*, Case No. 5:21-cv-00785-XR (W.D. Tex.) (the "**SEC Civil Action**").

should have known that Policy Services and the other deeproot Entities could never repay the money he had raised or borrowed from investors.

4.       Of the over $71,000,000 raised, Mueller paid himself an undetermined salary and other undisclosed payments. The Trustee's investigation is ongoing, but as of this writing, the Trustee believes that Mueller caused at least $3.00 million to be transferred out of the debtors for his personal benefit.[4] All of these transactions should be avoided, and damages awarded against Mueller individually.

5.       Mueller breached the fiduciary duty he owed to Policy Services and each of the deeproot Entities. He engaged in self-dealing in violation of the duty of loyalty and the duty of care. He raised investor money which he knew or should have known the debtors could not repay in violation of the duty of care. Finally, Mueller raised investor money in violation of the federal and state securities laws which itself is a violation of the duty of care. The damages resulting from Mueller's breach of his fiduciary duty is the amount of money raised from investors which the Trustee believes is $71,000,000. All profits he received from the Debtors should also be disgorged.

6.       Mueller filed three proofs of claim in these administratively consolidated cases. Those claims should be disallowed or subordinated.

## II.      PARTIES

7.       Plaintiff is the duly qualified and acting Chapter 7 Trustee of the jointly administered Bankruptcy Cases and brings suit on behalf of each of the debtor estates. Trustee brings this adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7001, 28 U.S.C. § 157, and all other applicable law.

---

[4] The SEC details in its complaint filed the SEC Civil Action a long list of transactions paid for on Mueller's personal credit cards, see SEC Civil Action, Dkt. 1, at Pages 17-18. These charges include: his child's private school tuition, federal income tax payments, medical and dental bills, family vacations, his second wedding, his second divorce, his third wedding, jewelry for his second and third wives, lifestyle spending for himself and his family.

8. Defendant Robert Jeffrey Mueller is an individual residing in Bexar County, San Antonio, Texas. He may be served via U.S. First Class Mail at 12015 Treewell Glen, San Antonio, Texas 78249, or wherever else he may be found.

## III. JURISDICTION

9. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1331 and 1334 and Fed. R. Bankr. P. 7001. This adversary proceeding constitutes a core proceeding pursuant to 28 U.S.C. § 157. To the extent necessary, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

10. To the extent the reference is withdrawn, or the Bankruptcy Court is unable to enter a final judgment, Plaintiff requests the Bankruptcy Court be permitted and assigned to preside over all pre-trial matters, including the issuance of findings of fact and conclusions of law.

## IV. VENUE

11. Venue in this adversary proceeding is proper before this Court pursuant to 28 U.S.C. § 1409.

## V. FACTS

12. Mueller served as the principal of all of the deeproot Entities and orchestrated a fraud and a Ponzi scheme wherein he offered and sold securities to individuals for investment in pooled investment funds. Mueller then used the invested money to fund his other business ventures, including his pinball machine business. He also used the money to fund his lavish lifestyle. For purposes of this lawsuit, the key fact is that he used later investors' money to pay earlier investors in order to keep the scheme going.

## A.  THE DEEPROOT ENTITIES AND THE PONZI SCHEME

13.     A Ponzi scheme is "a fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments." BLACK'S LAW DICTIONARY, Ponzi scheme (11th ed. 2019). A Ponzi scheme operates by using money from new investors to pay earlier investors, typically "without any operation or revenue-producing activity other than the continual raising of new funds." *Id.* "[A] Ponzi scheme is, as a matter of law, insolvent from its inception." *Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir. 2011).

14.     The deeproot Entities commenced operations in 2012. The first entity formed was Policy Services, Inc. deeproot Funds, LLC is a direct subsidiary of Policy Services, Inc.  The dGRD Fund, 575 Fund, and 5 Year Debenture Fund (the "**Subsidiary Funds**") were formed as direct subsidiaries of deeproot Funds, LLC. A review of the deeproot Entities' QuickBooks files and other financial books and records revealed that all of the Finders were paid commissions and fees from Policy Services in the range of 6% to 8% of the monies they brought in to the scheme. The amount of these commission payments is substantially out of market for legitimate investments. Instead, the commission structure was set high in order to entice the Finders to bring in unwary and unsophisticated investors. When the flow of new money slowed, Mueller would authorize and pay added incentives to the Finders to "find" new cash.

15.     Policy Services and its subsidiaries never received an initial equity investment from Mueller, and the deeproot Entities were all insolvent as of inception and continued to operate at a loss until Petition Date. The Subsidiary Funds appeared profitable, which Mueller used to entice new investors and obtain new money from investors.

16.     The Subsidiary Funds offered investments at higher-than-market levels of return—for example, deeproot BonusGrowth 5 Year Debenture Fund's five-year debenture bonds were offered for a 7% return in 2014, which was nearly seven times more than the national rate for five-year debenture bonds according to data available from the Board of Governors of the Federal Reserve. *See* Exhibit A.

17.     Investors in the 575 Fund committed their principal investment for a five-year term and were able to choose either simple annual interest of 7% per year paid out in a lump sum at the end of the term, or 5% simple annual interest paid out each month for the five-year term. For the dGRD Fund, the principal was committed for an indefinite time and investors were promised a potentially larger payout upon the maturity of a life insurance policy investment based on a complex first-in, first-out redemption process that would occur at an undetermined time.

18.     Mueller informed investors that the 575 Fund would invest "the simple majority of our Fund Assets" in life insurance policies even though Policy Services had already sold fractional interests in those same policies to earlier investors in Policy Services. He resold the policies. The 575 Fund allegedly purchased these life insurance policies indirectly by re-investing funds into the dGRD Fund, which then invested the majority of its assets in life insurance policies purchased by Policy Services.  Policy Services was the record owner and sole beneficiary of all of the life insurance policies and life settlements. The Subsidiary Funds never actually received any ownership or other interests in return for the monies funneled to Policy Services or the deeproot Entities.

19.     Mueller was responsible for drafting and disseminating the private placement memoranda ("**PPMs**") as well as other marketing materials for the Subsidiary Funds.  Although there were multiple versions of the PPMs, in general, the PPMs disclosed, among other things: (i)

the investment strategy and investors' expected returns; and (ii) that Mueller and deeproot had exclusive control over, and responsibility for, managing the Subsidiary Funds and their investments.

20.     As described in the PPMs, the investment strategy involved a plan to purchase life insurance policies that insured the lives of individuals not affiliated with Mueller or the deeproot Entities who had sold their life insurance policies for cash settlements while still alive, otherwise known as life settlements.  By purchasing these life insurance policies, the Subsidiary Funds would be entitled to the death benefit upon maturity (i.e., the death of the insured).  Although not disclosed in the 575 Fund PPM until 2019, the 575 Fund never held any interest in the life insurance policies directly, rather it purchased securities issued by the dGRD Fund, which in turn owned the life insurance policies (which was untrue – Policy Services was the owner and beneficiary of all the life insurance policies).

21.     There was no recorded capital investment on the deeproot balance sheet, and it appears that there was a deliberate effort to minimize the reported lack of profit.  Disbursements to Mueller and others for directing investor funds to Policy Services were improperly recorded as assets rather than expenses. Attached as Exhibit E-1 is list of commissions paid by Policy Services to Mueller or his related entities in the amount of $706,256.89 as early as 2012 to 2014, which were recorded as an asset on the Policy Services balance sheet on the Petition Date.  These commissions should have been recorded as expenses as they were incurred. After recharacterizing the disbursements as expenses, the equity for Policy Services was $(1,490,187) for the year ending on December 31, 2013, and $(423,785) for the year ending on December 31, 2012. Policy Services and its subsidiaries had minimal revenue and had no net income as of at least December 31, 2012.

Policy Services continued to operate at a loss from the time of its inception and all of the deeproot Entities remained insolvent until filing for bankruptcy on December 9, 2021.

22.     Based upon the books and records of deeproot Funds, LLC, from 2019 and 2021, the entity only generated $865 in revenue during its entire nine-year existence. Since there was no source of revenue, the deeproot Entities relied on newly invested money to fund operations and make payments to earlier investors. From 2013 until 2021, deeproot Funds, LLC used new investor money to pay interest and dividends to earlier investors; these payments were a major cost of deeproot Funds, LLC's annual operations. For example, during the final three years of the deeproot Entities' operation, the following payments were made: (i) in 2019, deeproot Funds, LLC received $18,300,190.00 from new investors and used $1,074,885.00 to pay previous investors; (ii) in 2020, deeproot Funds, LLC received $7,093,055 from new investors and used $1,333,554.00 to pay previous investors; and (iii) in 2021, deeproot Funds, LLC received $10,827,147 from new investors and used $918,391.00 to pay previous investors.

23.     Over $71,000,000 was received from investors. There were investor redemptions of $60,000 in 2020 and $1,951,135 in 2021, and $4,879,884 was remitted to the investors for interest and dividend payments. The remaining funds were principally transferred to other deeproot Entities or used to pay operating expenses. The deeproot Funds, LLC intercompany receivable balance was $57,797,231 on or about December 31, 2021. Transfers to Policy Services were used to fund $6,246,820 in Finder's Fees and Commissions.

24.     Policy Services paid Finder's Fees and Commissions to financial advisors who directed their clients' investments to Policy Services and the Subsidiary Funds. As discussed above, during its first years of operations, Policy Services capitalized these payments to understate their financial losses. The capitalized amount totals $2,540,123.

25.     Policy Services never generated sufficient profits to stabilize its operations.  As of December 31, 2021, Policy Services owed $36,769,087 to the various Subsidiary Funds and had reported negative equity of $(19,420,543).

**B.     THE FINDERS WERE PAID EXTRAORDINARY COMMISSIONS TO RAISE MONEY.**

26.     As the principal of the deeproot Entities, Mueller (through deeproot Funds, LLC) contracted with Finders all across the country to locate new investors and raise money for the deeproot Entities.  During the years ending December 31, 2015, through December 31, 2021, Policy Services recorded payments to financial advisors as Finders Fees totaling $5,318,648 and as commissions totaling $928,172.  Total payments for finding investors, including the capitalized payments discussed above, were $8,786,943.

27.     The vast majority of the Finders contracted by the deeproot Entities' were unregistered as broker-dealers despite the fact that they engaged in transactions to facilitate the sale of securities, including debenture bonds[5] and life settlements.[6] The Finders that were registered investment advisors or broker-dealers failed to conduct, and Mueller failed to offer, the most basic due diligence into the financial condition of the deeproot Entities when making investment recommendations to clients.  When financial information was provided it was patently

---

[5] The deeproot Entities obtained Form D exemptions from the SEC to offer these securities.

[6] Courts have recognized a so-called "finder's exception," which permits a person to "'perform a narrow scope of activities without triggering the b[r]oker/dealer registration requirements,'" such as "'[m]erely bringing together the parties to transactions, even those involving the purchase and sale of securities, is not enough'" to warrant broker registration. *S.E.C. v. Kramer*, 778 F. Supp. 2d 1320, 1336 (M.D. Fla. 2011) (quoting *Salamon v. Teleplus Enter., Inc.*, No. 05-2058 (WHW), 2008 WL 2277094, at *8 (D. N.J. 2008), and *Apex Global Partners, Inc. v. Kaye/Bassman Intern. Corp*., No. 3:09-cv-637-M, 2009 WL 2777869, at *3 (N.D. Tex. Aug. 31, 2009)). The most commonly cited factors as to whether someone was acting as a broker with respect to a given transaction are: "whether a person (1) works as an employee of the issuer, (2) receives a commission rather than a salary, (3) sells or earlier sold the securities of another issuer, (4) participates in negotiations between the issuer and investor, (5) provides either advice or a valuation as to the merit of an investment, and (6) actively (rather than passively) finds investors." *Id.* at 1334. "[T]ransaction-based compensation" is one of the hallmarks of being a broker-dealer. *Kramer*, 778 F. Supp. 2d at 1336 (*citing Cornhusker Energy Lexington, LLC v. Prospect St. Ventures*, 2006 WL 2620985, at *6 (D. Neb. 2006).

inaccurate. The deeproot Entities relied on these Finders to bring in a steady flow of money because there was no other source of revenue for the deeproot Entities other than newly invested money.

## C.  THE LIFE INSURANCE POLICIES WERE OVERSOLD.

28.    Between 2012 and 2017, Policy Services purchased twenty four life insurance policies for a combined purchase price of approximately $13,676,068.  The total face value of all of the policies, upon information and belief, was $36,000,000.  Initially Policy Services sold fractionalized interests in these policies for at least $6,000,000.  None of the money received from investors was placed into an escrow account to fund future premiums which would come due on these policies until the death of the insured.

29.    Between April 2017 and August 2019, four life insurance policies matured and paid a death benefit.  The combined face value of the four life insurance policies that matured was $1,146,021. Policy Services' purchase price for the four policies was $664,061.64. The total death benefit paid upon maturity was $1,156,030.94.  The records of Policy Services are unclear as to whether, upon Policy Services' receipt of each death benefit, Policy Services distributed the funds to each investor who had invested in each such policy that investors respective proportionate share (or fractionalized interest) of the death benefit.  The amount of the death benefit received by Policy Services and not distributed to investors was recorded in Policy Services' books as a capital gain.

30.    Of the twenty-four life insurance policies purchased by Policy Services, twenty two of the life insurance policies were purchased from the same provider ("**Cycladic**").

31.    On or about April 25, 2017, Cycladic purchased a life settlement related to a certain Ms. Basha (the "**Basha Policy**") on the secondary life settlement market for a purchase price in the amount of $842,022.  The face amount or death benefit on this policy was $9,000,000 or one

quarter of the life insurance portfolio Mueller represented that Policy Services owned. On or about May 16, 2017, Policy Services and Cycladic entered into a certain Life Insurance Policy Purchase and Sale Agreement (the "**Basha Purchase Agreement**"), pursuant to which Cycladic sold the Basha Policy to Policy Services for a purchase price in the amount of $4,247,022 (the "**Basha Purchase Price**"). The Basha Purchase Price was to be paid by Policy Services through a series of installment payments, the final payment to be paid by Policy Services no later than December 31, 2017. Until the Basha Purchase Price was paid in full, Policy Services apparently did not even have ownership rights in the Basha Policy.

32.     Because Policy Services generated no revenue, it relied on the receipt of new investor monies to fund the installment payments due on the purchase of the Basha Policy. Ultimately, Policy Services was not able to raise new investor monies in amounts sufficient to pay the installment payments and premium payments when due, nor was Policy Services able to pay the balance of the Basha Purchase Price when due.

33.     On November 1, 2018, Policy Services executed a secured promissory note (the "**Secured Note**"), secured by the Basha Policy and payable to Cycladic in the principal amount of $1,080,000, the amount of the Basha Purchase Price that then remained outstanding under the Basha Purchase Agreement. In February 2019, Policy Services failed to make a required installment payment in the amount of $180,000 and defaulted on the Note balance of $836,522, which remained due and owing from Policy Services to Cycladic.

34.     On April 5, 2019, Mueller sent an email to the principal of Cycladic, providing a detailed account of the financial peril deeproot was experiencing:

> "Under the PPM, we have to notify investors is (sic.) there is a 'default' of any kind on an underlying asset. However, it is a gray area whether a breach of contract with a remedy is equal to a default that we would need to notify investors about.  I look forward to reading the language [of the Relinquishment Agreement] carefully to

avoid at all costs having a duty to inform investors; which would be the end of the business."

"I have stopped pay for everyone."

"I want to reiterate that I started pinball because we would be out of business without it. No LS [Life Settlement] company has ever survived without another business or capital leveraging to bide time for maturities to happen."

"We cannot layoff workers at this time…. We would have to take measures like bankruptcy that would end the business."

"Even a prudent sale of assets if we did shelve [pinball] would require notifying investors of the loss. Which means the end of the investment side of the business."

It is clear from the contents of Mueller's email that the Debtors were insolvent at the time it was sent by Mueller. Policy Services could not pay its obligations as they came due. Moreover, it is clear that Mueller knew that he was required by the PPM to notify investors of the loss of the Basha Policy. Mueller made no disclosure to investors either when he executed the relinquishment agreement or when the Basha Policy was ultimately sold. A copy of the email is attached hereto as Exhibit B. To the contrary, from April 2019 to December 2021, Mueller raised approximately $35 million in new investor money.

35.     On April 8, 2019, Policy Services and Cycladic entered into a Policy Relinquishment and Loan Satisfaction Agreement ("**Relinquishment Agreement**"). Pursuant to the Relinquishment Agreement, Policy Services transferred ownership of the Basha Policy, and the right to designate a beneficiary, back to Cycladic. Thereafter, Cycladic sold the Basha Policy to a provider on the secondary market and on October 15, 2019, received sale proceeds in the amount of $843,265, such amount being $1,243 more than the $842,022 Cycladic had originally paid to acquire the Basha Policy.

36.     At no time did Mueller notify the investors of the loss of the Basha Policy, nor did Mueller disclose the financial condition of the Debtors.

37.     New investor money was, for a time, used by Policy Services to pay premiums due on the remaining life insurance policies that it still owned, but despite the influx of new investor money, by the end of 2021 Mueller had run out of cash and allowed nearly half of those policies to lapse. The Ponzi scheme collapsed.

**D.     THE MUELLER TRANSFERS**

38.     Even though Mueller, through the Debtors, raised in excess of $71 million from investors, the vast majority of that money was never invested as represented in the PPMs. Rather, the money was used to fund Mueller's deeproot-affiliated businesses, including a pinball machine business, and to make dividend and interest payments to earlier investors using money raised from new investors.   The Trustee's investigation to date has uncovered at least $3,000,000 in undisclosed transfers to Mueller.

**a.     Commissions**

39.     Mueller used approximately $706,027.00 from Debtors' bank accounts to pay himself commissions and fees from 2012 to 2014, and he used approximately $2.1 million from the Debtors' bank accounts to pay his personal expenses, including his daughter's private school tuition, federal income tax payments, medical and dental bills, family vacations, his second wedding, his second divorce, his third wedding, jewelry for his second and third wives, and lifestyle spending for himself and his family (collectively, the "**Mueller Transfers**").

**b.     Personal Credit Card Charges**

40.     Approximately $1.7 million of the Muller Transfers were charged by Mueller between 2014 and 2021 to Mueller's personal credit cards, an American Express Business Gold Rewards Card and Chase Rapid Rewards Visa Card.  Mueller paid American Express and Chase for the personal expenses charged to these credit cards using Policy Services' bank accounts.

### c. Family Trust Payments

41.     Between November 2016 and August 2018, Mueller also transferred approximately $330,000 of investor funds for the benefit of MB Hale Ohana Revocable Trust (the "**Ohana Trust**"), a Mueller family trust for which Mueller, his father Jeffrey L. Mueller, and his stepmother Belinda G. Breen served as co-trustees.   These funds were used for the purchase of two condominiums in Kauai, Hawaii.

42.     On or about May 7, 2019, Mueller executed a gift letter documenting the $135,000.00 gift to Jeffrey L. Mueller and Belinda B. Breen "to be applied toward the purchase of" the 2611 Kiahuna Plantation Dr. condominium.  A copy of the gift letter is attached as Exhibit C.  Mueller signed the gift letter as the "Donor," but the money came from a Wells Fargo account ending in -8487, which bank account belongs to Policy Services.

43.     On or about May 20, 2021, the Ohana Trust sold the 4330 Kauai Beach Condo for $526,044.00, with $495,860.57 paid to sellers. Handwritten notes on the Final Seller's Statement indicate that Mueller received roughly $269,000 from the sale of the condominium. *Id.* Mueller also confirmed the receipt of funds (albeit in a different amount) [7] in his Use of Funds Brief filed in the SEC Civil Action. SEC Civil Action, Dkt. No. 15. The Use of Funds Brief also details Mueller's further transfers of the sales proceeds. *Id*

44.     Jeffrey L. Mueller and Belinda B. Breen sold the 2611 Kiahuna Plantation condominium in November 2021 for $1.65 million. Per the Seller's Statement, $876,659.66 was paid to Jeffrey Mueller and Belinda Breen, who set aside $135,000 of the sale proceeds into a

---

[7] In his Use of Funds Brief, Mueller says he received $290,000.00 from the sale of the condominium. SEC Civil Action, Dkt. No. 15.

segregated bank account to repay the Policy Services estate.[8] Although some of the funds were recovered from the other two Trustees, at least $87,000 of the proceeds remains subject to a Freeze Order issued by the District Court in the SEC Civil Action.

## VI.    CAUSES OF ACTION

45.    Paragraphs 1 through 42 are incorporated herein by reference.

### Count 1 – Avoidance of Fraudulent Transfer under 11 U.S.C. §§ 548(a)(1)(A) (Mueller) (Actual Fraud)

46.    Pursuant to 11 U.S.C. § 548(a)(1)(A), the Trustee files this complaint seeking to avoid a fraudulent transfer, imposition of a constructive trust on fraudulently transferred property of the Debtors, and/or for damages against the fraudulent transferees of the Debtors during the applicable time periods.

47.    The Mueller Transfers in the amount of $175,840.00, as well as any concealed or undisclosed transactions, to Mueller, were made within the two years prior to the Petition Date and constitute a transfer of the deeproot Entities' interest in property. Exhibit D.

48.    The Mueller Transfers were made with actual intent to hinder, delay or defraud the Debtors' creditors, as evidenced by the existence of a Ponzi scheme wherein interest and dividend payments were made to earlier investors from new investor money.

49.    Debtors were insolvent at the time of its creation and at the time of each of the Mueller Transfers or became insolvent as a result of the Mueller Transfers, in that (a) the sum of

---

[8] On September 8, 2022, the Trustee filed *Trustee's Motion to Approve Compromise and Settlement under Bankruptcy Rule 9019 with the MB Ohana Revocable Trust, Jeffrey L. Mueller, and Belinda B. Breen* [ECF No. 149], and on October 10, 2022, the Court entered its Order granting the Trustee's Motion [ECF No. 166].  Pursuant to the Court approved settlement agreement between the the Trustee and the Ohana Trust, Jeffrey L. Mueller, and Belinda B. Breen (the "**Trust Parties**"), in exchange for the Trustee releasing his claims against the Trust Parties, the Trust Parties agreed to pay, and did pay, $300,000 to the Bankruptcy Estate of Policy Services.  Mueller was not a party to the settlement agreement between the Trustee and the Trust Parties, and none of Trustee's claims against Mueller were released.

the Debtors' debts were greater than all of the Debtors' assets at a fair valuation; (b) Debtors were engaging in or about to engage in a business or transaction for which Debtors remaining assets were unreasonably small in relation to the business or transaction; or (c) Debtors were intending to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due.

50.     There was no capital infusion at the time Policy Services, Inc. was created.

51.     Therefore, the Trustee has demonstrated that the Mueller Transfers constituted fraudulent transfers under 11 U.S.C. §548(a)(1)(A), such that the Trustee is entitled to a judgment in the amount of $175,840.00 on behalf of the Estate to recover the Mueller Transfers from Defendant Mueller.

### Count 2 – Avoidance of Fraudulent Transfer under 11 U.S.C. §§ 548(a)(1)(B) (Mueller) (Constructive Fraud)

52.     Pursuant to 11 U.S.C. § 548(a)(1)(B), the Trustee files this complaint seeking to avoid a fraudulent transfer, imposition of a constructive trust on fraudulently transferred property of Debtors, and/or for damages against the fraudulent transferees of Debtors during the applicable time periods.

53.     The Mueller Transfers in the amount of $175,840.00 were made within two years of the Petition Date and constitute a transfer of Debtors' interest in property. Exhibit D.

54.     Debtors were insolvent at the time of its creation and at the time of each of the Mueller Transfers or became insolvent as a result of the Mueller Transfers, in that (a) the sum of the Debtors' debts were greater than all of the Debtors' assets at a fair valuation; (b) Debtors were engaging in or about to engage in a business or transaction for which Debtors remaining assets were unreasonably small in relation to the business or transaction; or (c) Debtors were intending

to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due.

55.     Debtors did not receive reasonably equivalent value in exchange for the Mueller Transfers.

56.     Therefore, the Trustee has demonstrated that the Mueller Transfers constituted fraudulent transfers under 11 U.S.C. §548(a)(1)(B), such that the Trustee is entitled to a judgment in the amount of $175,840.00 on behalf of the Estate to recover the Mueller Transfers from Defendant Mueller.

## Count 3 – Avoidance of Fraudulent Transfer under 11 U.S.C. § 544 and the Texas Uniform Fraudulent Transfer Act (Tex. Bus. & Com. Code § 24.005(a)(1)) (Mueller) (TUFTA Actual Fraud)

57.     Pursuant to 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.005(a)(1), the Trustee files this complaint seeking to avoid a fraudulent transfer, imposition of a constructive trust on fraudulently transferred property of Debtors, and/or for damages against the fraudulent transferees of Debtors during the applicable time periods.

58.     The Mueller Transfers in the amount of $2,804,797.06 were made between June 21, 2012 and August 4, 2021, and constitute a transfer of Debtors' interest in property. Exhibit E.

59.     The Mueller Transfers were made with an actual intent to hinder, delay or defraud the creditors of Debtor Policy Services, Inc., as evidenced by the existence of a Ponzi scheme wherein interest and dividend payments were made to earlier investors from new investor money.

Debtors were insolvent at the time of its creation and at the time of each of the Mueller Transfers or became insolvent as a result of the Mueller Transfers, in that (a) the sum of the Debtors' debts were greater than all of the Debtors' assets at a fair valuation; (b) Debtors were engaging in or about to engage in a business or transaction for which Debtors remaining assets were unreasonably small in relation to the business or transaction; or (c) Debtors were intending

to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due.

60.     Debtors had at least one outstanding creditor at the time of each of the Mueller Transfers, or such creditor's claim arose within a reasonable time after the Mueller Transfers, which currently remains unpaid.

61.     Pursuant to Tex. Bus. & Com. Code § 24.010(a)(1), the Trustee brings this action within one year of the date Trustee discovered or could reasonably have discovered the FHC 544 Transfers. The Trustee has demonstrated that the Mueller Transfers constituted fraudulent transfers under 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.005(a)(1), such that the Trustee is entitled to a judgment in the amount of $2,804,797.06 on behalf of the Estate to recover the Mueller Transfers from Defendant Mueller.

## Count 4 – Avoidance of Fraudulent Transfer under 11 U.S.C. § 544 and the Texas Uniform Fraudulent Transfer Act (Tex. Bus. & Com. Code § 24.005(a)(2)) (Mueller) (TUFTA Constructive Fraud)

62.     Pursuant to 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.005(a)(2), the Trustee files this complaint seeking to avoid a fraudulent transfer, imposition of a constructive trust on fraudulently transferred property of Debtors, and/or for damages against the fraudulent transferees of Debtors during the applicable time periods.

63.     The Mueller Transfers in the amount of $933,777.38 were made within the four years preceding the Petition Date and constitute a transfer of Debtors' interest in property. Exhibit F.

64.     Debtors were insolvent at the time of its creation and at the time of each of the Mueller Transfers or became insolvent as a result of the Mueller Transfers, in that (a) the sum of the Debtors' debts were greater than all of the Debtors' assets at a fair valuation; (b) Debtors were engaging in or about to engage in a business or transaction for which Debtors remaining assets

were unreasonably small in relation to the business or transaction; or (c) Debtors were intending to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due.

65.      Debtors did not receive reasonably equivalent value in exchange for the Mueller Transfers.

66.      Debtors had at least one outstanding creditor at the time of the Mueller Transfers, or such creditor's claim arose within a reasonable time after the Mueller Transfers, which currently remains unpaid.

67.      Therefore, the Trustee has demonstrated that the Mueller Transfers constituted fraudulent transfers under 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.005(a)(2), such that the Trustee is entitled to a judgment in the amount of $933,777.38 on behalf of the Estate to recover the Mueller Transfers from Defendant Mueller.

## Count 5 – Avoidance of Fraudulent Transfer under 11 U.S.C. § 544 and the Texas Uniform Fraudulent Transfer Act (Tex. Bus. & Com. Code § 24.006(a)) (Mueller)

68.      Pursuant to 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.006(a), the Trustee files this complaint seeking to avoid a fraudulent transfer, imposition of a constructive trust on fraudulently transferred property of Debtors, and/or for damages against the fraudulent transferees of Debtors during the applicable time periods.

69.      The Mueller Transfers in the amount of $933,777.38 were made within the four years preceding the Petition Date and constitute a transfer of Debtors' interest in property. Exhibit F.

70.      Debtors were insolvent at the time of its creation and at the time of each of the Mueller Transfers or became insolvent as a result of the Mueller Transfers, in that (a) the sum of the Debtors' debts were greater than all of the Debtors' assets at a fair valuation; (b) Debtors were

engaging in or about to engage in a business or transaction for which Debtors remaining assets were unreasonably small in relation to the business or transaction; or (c) Debtors were intending to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due.

71.     Debtors did not receive reasonably equivalent value in exchange for the Mueller Transfers.

72.     Debtors had at least one outstanding creditor at the time of the Mueller Transfers, which currently remains unpaid.

73.     Therefore, the Trustee has demonstrated that the Mueller Transfers constituted fraudulent transfers under 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.006(a), such that the Trustee is entitled to a judgment in the amount of $933,777.38 on behalf of the Estate to recover the Mueller Transfers from Defendant Mueller.

## Count 6 – Avoidance of Preferential Transfers under 11 U.S.C. § 547(b) (Mueller)

74.     Pursuant to 11 U.S.C. § 547(b) the Trustee files this complaint seeking to avoid a preferential transfer, imposition of a constructive trust on preferentially transferred property of Debtors, and/or for damages against the preferential transferees of Debtors during the applicable time periods.

75.     Mueller is an insider of the Debtors pursuant to 11 U.S.C. § 101(31). He was the sole principal and director of each of the deeproot Entities. The Mueller Transfers in the amount of $68,670.00 were made within one year of the Petition Date and constitute a transfer of Debtors' interest in property. Exhibit G.

76.     The Mueller Transfers were made, or caused to be made, to or for the benefit of Mueller, a creditor and insider of Debtor. Mueller paid himself commissions and also used Policy Services' funds to pay his personal credit card expenses.

77.     The Mueller Transfers were made, or caused to be made, for or on account of an antecedent debt owed by Debtor to Mueller prior to the date on which such Mueller Transfers were made.

78.     Debtors were insolvent at the time of its creation and at the time of each of the Mueller Transfers or became insolvent as a result of the Mueller Transfers, in that (a) the sum of the Debtors' debts were greater than all of the Debtors' assets at a fair valuation; (b) Debtors were engaging in or about to engage in a business or transaction for which Debtors remaining assets were unreasonably small in relation to the business or transaction; or (c) Debtors were intending to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due.

79.     The Mueller Transfers enabled Mueller to receive more of his then outstanding claims than he would have received if: (a) paid in the ordinary disposition of the bankruptcy Estate under the Bankruptcy Code; (b) the Muller Transfers had not been made; and (c) Mueller had received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

80.     Therefore, the Trustee has demonstrated that the Mueller Transfers may be avoided under 11 U.S.C. § 547(b), such that the Trustee is entitled to a judgment in the amount of $68,670.00 on behalf of the Estate to recover the Mueller Transfers from Defendant Mueller.

## Count 7 - Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550 and the Texas Uniform Fraudulent Transfer Act (Tex. Bus. & Com. Code § 24.005(a)(1))

81.     Mueller was the initial transferee of the Mueller Transfers.

82. The Trustee is entitled to recover from Mueller, or any immediate or mediate transferee of Mueller, the Mueller Transfers, or the value of the Mueller Transfers, along with post-judgment interest, pursuant to section 550 of the Bankruptcy Code and section 24.009(b) of the Texas Business and Commerce Code.

### Count 8 – Breach of Fiduciary Duty (Mueller)

83. As the sole director, principal, and manager of the Debtors, Mueller owes the Debtors fiduciary duties, including, but not limited to duties of loyalty and care.

84. Mueller breached his fiduciary duty of loyalty to Debtors when he engaged in self-dealing by transferring millions of dollars of Debtors' funds to pay himself commissions and to pay his personal expenses.

85. Mueller breached his fiduciary duty of care to Debtors when he continued to solicit and accept investor money and thus increasing the liability of Debtors after he clearly knew that the Debtors were insolvent, and that the business was failing.

86. Mueller breached his fiduciary duty of care to Debtors when he caused Debtors to use new investor money to make dividend and interest payments to previous investors, causing Debtors to operate as a Ponzi scheme.

87. Mueller breached his fiduciary duty of care to Debtors when under his direction Policy Services entered into and then defaulted on the agreement to purchase the Basha Policy, and then relinquished the Basha Policy as described above, causing Policy Services to pay Cycladic $3.4 million and receive nothing of value in return.

88. Mueller breached his fiduciary duty of care to Debtors when he knowingly violated the provisions of the PPMs by failing to inform Debtors' investors of the relinquishment of the Basha Policy, thus subjecting the Debtors to liability to their investors.

89.     Mueller breached his fiduciary duty of care to Debtors by causing Debtors to pay commissions and finder's fees to the Finders who were not licensed to sell securities.

90.     Mueller breached his fiduciary duty of care to Debtors when he caused the Subsidiary Funds to sell securities without authority, causing Debtors to incur liability for violations of the Securities and Exchange Acts of the United States and subjecting Debtors to liability.

91.     Mueller's breaches of his fiduciary duties of loyalty and care to the Debtors have caused at least $3,000,000 and no more than $72,000,000 in damages to the debtors estates for which the Trustee is entitled to a judgment.

## Count 9 – Objection to and Equitable Subordination of Mueller's Proofs of Claims under 11 U.S.C. § 502 (Mueller)

92.     Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3001(c)(1), the Trustee files this complaint objecting to Proof of Claim No. 153-1 filed by Mueller on March 22, 2022, in the amount of $25,025, Number 153 in the Claims Register of Case No. 21-51513; Proof of Claim No. 154-2 filed by Mueller on March 28, 2022, in the amount of $50,000, Number 154 in the Claims Register of Case No. 21-51513; and Proof of Claim No. 111-1 filed by Mueller on March 22, 2022, in the amount of $5,460, Number 111 in the Claims Register of Case No. 21-51520.

93.     Based upon the conduct of Mueller described above, all of Mueller's claims should be disallowed.

94.     Alternatively, based upon the conduct of Mueller described above, each of Mueller's claims should be equitably subordinated to the claims of all other creditors of debtors because (i) Mueller engaged in inequitable conduct, (ii) Mueller's conduct resulted in harm to the creditors, and (iii) equitable subordination of Mueller's claims is not inconsistent with the Bankruptcy Code.

95.     Therefore, the Trustee asks that the Court disallow each of Mueller's claims pursuant to 11 U.S.C. §502(b)(1).

96.     In the alternative to disallowing Mueller's claims, the Trustee asks the Court to equitably subordinate each of Mueller's claims to the claims of all other creditors of the Debtors pursuant to 11 U.S.C. §510(c)(1).

**[Remainder of page left intentionally blank]**

<u>**PRAYER**</u>

WHEREFORE, JOHN PATRICK LOWE, Chapter 7 Trustee for the Bankruptcy Estate of deeproot Capital Management, LLC, prays for judgment in favor of the Chapter 7 Trustee on all claims and relief sought herein, including but not limited to:

a. Judgment for all actual damages in the amounts ranging between $3,000,000 and $72,000,000 or as otherwise proved at trial;

b. Constructive trust on the Defendants' assets and all property received from the Debtors, and disgorgement of all profits or benefits received from the Debtors

c. Pre-judgment interest at the highest rate allowed by law;

d. Post-judgment interest at the highest rate allowed by law from the date of judgment until paid;

e. All costs of court for this action; and

f. Such other and further relief, at law or in equity, as the Court deems to be just, proper, and equitable.

Respectfully submitted,

**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

By:   /s/ Randall A. Pulman
      Randall A. Pulman
      Texas State Bar No. 16393250
      rpulman@pulmanlaw.com
      W. Drew Mallender
      Texas State Bar No. 24118450
      dmallender@pulmanlaw.com
      Anna K. MacFarlane
      Texas State Bar No. 24116701
      amacfarlane@pulmanlaw.com

**ATTORNEYS FOR JOHN PATRICK LOWE, CHAPTER 7 TRUSTEE FOR DEEPROOT CAPITAL MANAGEMENT, LLC ET AL.**

{00560857;3}                    26

# EXHIBIT A



Source: Board of Governors of the Federal Reserve System (US)          fred.stlouisfed.org

22-50597-rmm Doc#20-3 Filed 12/08/22 Entered 12/08/22 13:15:34 Exhibit Exhibit C Pg 29 of 30 of 50

# EXHIBIT B

| From: | Robert J. Mueller <robert@deeprootfunds.com> |
| --- | --- |
| Sent: | Friday, April 5, 2019 12:31 PM |
| To: | 'Tom Andrew' <tomandrew@yahoo.com> |
| Subject: | deeproot |

Tom,

Just checking up on the letter. I talked with my local attorney about this. Under the PPM, we have to notify investors is there is a 'default' of any kind on an underlying asset. However, it is gray area whether a breach of contract with a remedy is equal to a default that we would need to notify investors about. I look forward to reading the language carefully to avoid at all costs having a duty to inform investors; which would be the end of the business.

I have spoken multiple times with Nate, Scott and our attorney here and discussed several of the options that present themselves. For the record, I have stopped pay for everyone. Under payday laws that can only last past the next pay day which would be May 1. Only 1 person has quit thus far.

I want to reiterate that I started pinball because we would be out of business without it. No LS company has ever survived without another business or capital leveraging to bide time for maturities to happen. While I understand your anger that Basha should have been paid off sooner (and I agree), without pinball we might has well just close down. Most of our policies are over LE+1, some LE+2. Even if we had bought 2-3 more policies over the last 2 years instead of pinball, we'd still be in the same place...no maturities and mountains of premiums and expenses we'd continue have to bring additional $ in to cover.

Since we have committed to pinball, we now have some legal issues to figure out:

- We cannot layoff workers at this time. There is a 1 to 3 month severance required that state payday laws require to be paid by the next pay date after the layoff. We don't have the capital to do so. We would have to take measures like bankruptcy that would end the business.
- We might be able to lay off workers a little bit at a time, but morale and productivity would plummet where we would have to close the pinball project. That would require notifying investors of the loss of the project, which means the end of the investment side of the business.
- We can encourage employees to leave voluntarily (meaning no severance). However, my attorney warned me that that would violate state laws and give rise to legal and administrative liability that would have to be reported to investors, which means the end of the investment side of the business.
- Employees aside, we cannot shelve the pinball project and then pick it up later. It is too complex, the re-startup costs too high, and the bad press would be hard to overcome. Even a prudent sale of assets if we did shelve it would require notifying investors of the loss. Which means the end of the investment side of the business.

We've tried conventional and alternative loans but our life policies and pre-revenue state is a no-go. I think Nate, Scott and I are in agreement that there are three logical paths forward:

- PREFERABLE & LIKELY. We sell one or more policies that would cover your Basha losses, and provide to us ~$4MM that would finish pinball and launch Aug-Sept timeline. My engineers already have pulled back most of the innovations to focus on launching quick. That would allow us to do two things that would affect you. We could then use a portion of normal investment revenue to start purchasing policies again until launch. And after launch, we would then start using revenues to start buying policies again to get out balance sheet back up.
- PREFERABLE BUT UNLIKELY. We find an angel investor willing to put up $4MM for some of my 100% equity most likely in a convertible note.
- NOT PREFERABLE. We continue in the drip death spiral we've been in the last year, by bringing in $800k-$1MM a month, with expenses of $1MM - $1.5MM per month until we can't anymore; or pray that a maturity happens to keep us going. We have done some damage by squeezing most of our agents hard over the last two months. I

CONFIDENTIAL

want to be sensible about how much we can expect them to continue to send us biz, while still trying to recruit more agents at the same time.

I look forward to speaking to you about this.

Best,

Robert

========================================

Robert J. Mueller, Principal
deeproot® Family of Companies

Phys: 12621 Silicon Dr, San Antonio, TX 78249
Mail: P.O. Box 691610, San Antonio, TX 78269

Office: (888) 316-2935 x101
Mobile: (210) 602-8724
Facsimile: (888) 316-2782
http://www.deeprootfunds.com

Investments in securities carry unique risks. Please carefully read the risks and disclosures contained in our Private Placement Memorandum or consult with your Broker/Investment Advisor/Accountant/ Attorney prior to making any investment. Nothing in this email shall constitute an offer or solicitation to buy or sell any security. Offers are only made via Sales Packet which contains a PPM, Application & Subscription Agreement, and other offering documents. Prior to investing, potential Investors need to fill out various suitability and accreditation forms and be approved by the Company. Information contained in this email is for the recipient and may be of a confidential nature. As such the recipient should be careful in sharing any information contained here. More information can be found on the Company's website or by contacting us.

**CYCL006122**

# EXHIBIT C

# Gift Letter

I/We do hereby certify to the following:

I/We (Donor) have made a gift of $ 135,000.00 (One Hundred Thirty-Five Thousand and xx/100) dollars to the Borrower(s) named below, and no repayment of this gift is expected or implied either in the form of cash or future services of the recipient.

**Jeffrey L Mueller**

**Belinda G Breen**

This gift is to be applied toward the purchase of the property located at:

**2611 KIAHUNA PLANTATION DRIVE APT 7E**

**KOLOA, HI  96756**

The source of funds for this gift is:

Bank Name: ___Wells Fargo_____

Type of Account: [ x ] Checking    [  ] Savings    [  ] Other

Account No.: __        487_____

Relationship to Borrower: ___Son_____

Donor's name: ___Robert J. Mueller_____

Street address: ___12015 Treewell Gln_____

City: ___San Antonio_____ State: ___TX_____ Zip: ___78249_____

Donor Telephone: ___210___ - __   _____ - __   _____

Donor Email: __   @hotmail.com_____

Please provide the best time we may contact you in the event we have any questions:

[  ] Morning [  ] Mid-day [  ] Evening [  ] Other _____

Have the Funds already been transferred to the recipient [ x ] Yes [  ] No

_____        ___5/7/2019_____
* Donor Signature                                                         Date

_____        _____
* Borrower Signature (Recipient)                              Date

_____        _____
* Borrower Signature (Recipient)                              Date

**If the gift funds are in the homebuyer's account,** Guaranteed Rate must document the transfer of the funds from the donor to the Recipient by obtaining a copy of the canceled check or other withdrawal document showing the withdrawal is from the donor's personal account, along with the Recipient's deposit slip or bank statement that shows the deposit.

**If the gift funds are to be provided at closing,** the transfer of the gift funds is by certified check made on the donor's account, the Guaranteed Rate must obtain a bank statement showing the withdrawal from the donor's personal account as well as a copy of the certified check. If the donor purchased a cashier's check, money order, official check or any other type of bank check as a means of transferring the gift funds, then the donor must provide a withdrawal document or canceled check for the amount of the gift showing the funds came from the donor's personal account. If the donor borrowed the gift funds and, thus, cannot provide the documentation from his or her bank or other savings account, the donor must provide evidence that those funds were borrowed from an acceptable source, i.e., not from a party to the transaction including the mortgage lender.

**When the transfer occurs at closing**, Guaranteed Rate must obtain verification the closing agent received funds from the donor for the amount of the gift.

Please Note: Upon the signature(s) of this gift letter, I/We hereby certify that any funds given to the homebuyer were not made available to the donor from any person or entity with an interest in the sale of the property including the seller, real estate agent, broker, builder, or loan officer, or any other entity associated with this transaction.

# EXHIBIT D

7:15 PM
08/25/22
Accrual Basis

22-05097-mmp  Doc#1  Filed 12/08/22  Policy Services ... Main Document  Pg 35 of

**Transactions by Account**

All Transactions

| Type | Date | Num | Name | Memo | Split | Clr | Amount | Balance |
|---|---|---|---|---|---|---|---|---|
| Check | 12/19/2019 | | Chase | | Client Reserve 3081 | | 990.00 | 1,923,690.17 |
| Check | 12/19/2019 | | Chase | | Client Reserve 3081 | | 9,000.00 | 1,932,690.17 |
| Check | 12/31/2019 | | Chase | | Client Reserve 3081 | | 6,000.00 | 1,938,690.17 |
| Check | 01/10/2020 | | Chase | | Client Reserve 3081 | | 12,000.00 | 1,950,690.17 |
| Check | 01/27/2020 | | Chase | | Client Reserve 3081 | | 3,000.00 | 1,953,690.17 |
| Check | 01/27/2020 | | Chase | | Client Reserve 3081 | | 4,000.00 | 1,957,690.17 |
| Check | 01/30/2020 | | USAA | | Client Reserve 3081 | | 3,730.00 | 1,961,420.17 |
| Check | 02/10/2020 | | Chase | | Client Reserve 3081 | | 5,000.00 | 1,966,420.17 |
| Check | 02/12/2020 | | Chase | | Client Reserve 3081 | | 5,000.00 | 1,971,420.17 |
| Check | 02/21/2020 | | Chase | | Client Reserve 3081 | | 5,000.00 | 1,976,420.17 |
| Check | 02/26/2020 | 19 | USAA | | Client Reserve 3081 | | 5,000.00 | 1,981,420.17 |
| Check | 02/27/2020 | | Chase | | Client Reserve 3081 | | 2,500.00 | 1,983,920.17 |
| Check | 02/27/2020 | | Chase | | Client Reserve 3081 | | 2,500.00 | 1,986,420.17 |
| Check | 03/24/2020 | | USAA | | Client Reserve 3081 | | 5,000.00 | 1,991,420.17 |
| Check | 03/25/2020 | | Chase | | Client Reserve 3081 | | 3,000.00 | 1,994,420.17 |
| Check | 03/25/2020 | | Chase | | Client Reserve 3081 | | 4,000.00 | 1,998,420.17 |
| Check | 04/02/2020 | | USAA | | Client Reserve 3081 | | 1,750.00 | 2,000,170.17 |
| Check | 04/29/2020 | | USAA | | Client Reserve 3081 | | 9,000.00 | 2,009,170.17 |
| Check | 04/30/2020 | | Chase | | Client Reserve 3081 | | 5,000.00 | 2,014,170.17 |
| Check | 05/11/2020 | | USAA | | Client Reserve 3081 | | 5,000.00 | 2,019,170.17 |
| Check | 05/20/2020 | | Chase | | Client Reserve 3081 | | 2,000.00 | 2,021,170.17 |
| Check | 05/20/2020 | | Chase | | Client Reserve 3081 | | 7,000.00 | 2,028,170.17 |
| Check | 06/17/2020 | | Chase | | Client Reserve 3081 | | 1,000.00 | 2,029,170.17 |
| Check | 06/17/2020 | | Chase | | Client Reserve 3081 | | 4,000.00 | 2,033,170.17 |
| Check | 08/04/2020 | | USAA | | Client Reserve 3081 | | 4,000.00 | 2,037,170.17 |
| Check | 08/05/2020 | | Chase | | Client Reserve 3081 | | 700.00 | 2,037,870.17 |
| Check | 08/05/2020 | | Chase | | Client Reserve 3081 | | 2,300.00 | 2,040,170.17 |
| Deposit | 08/10/2020 | | | Deposit | Client Reserve 3081 | | -2,000.00 | 2,038,170.17 |
| Deposit | 08/10/2020 | | | Deposit | Client Reserve 3081 | | -5,500.00 | 2,032,670.17 |
| Check | 08/18/2020 | | USAA | | Sweep Account 8487 | | 35,000.00 | 2,067,670.17 |
| Check | 10/13/2020 | | transfer | | Client Reserve 3081 | | 1,500.00 | 2,069,170.17 |
| Deposit | 10/27/2020 | | USAA | Deposit | Client Reserve 3081 | | -48,500.00 | 2,020,670.17 |
| Check | 11/12/2020 | | USAA | | Client Reserve 3081 | | -3,000.00 | 2,017,670.17 |
| Deposit | 11/19/2020 | | Chase | Deposit | Client Reserve 3081 | | 2,200.00 | 2,019,870.17 |
| Check | 11/30/2020 | | USAA | | Client Reserve 3081 | | 10,000.00 | 2,029,870.17 |
| Check | 12/15/2020 | | USAA | | Client Reserve 3081 | | 5,000.00 | 2,034,870.17 |
| Check | 01/04/2021 | | Chase | | Client Reserve 3081 | | 200.00 | 2,035,070.17 |
| Check | 01/04/2021 | | Chase | | Client Reserve 3081 | | 820.00 | 2,035,890.17 |
| Check | 01/08/2021 | | Robert J Mueller | | Sweep Account 8487 | | 48,500.00 | 2,084,390.17 |
| Check | 01/12/2021 | | Chase | | Client Reserve 3081 | | 1,000.00 | 2,085,390.17 |
| Check | 01/12/2021 | | Chase | | Client Reserve 3081 | | 10,000.00 | 2,095,390.17 |
| Deposit | 01/20/2021 | | Robert J Mueller | Wire transfer | Client Reserve 3081 | | -20,000.00 | 2,075,390.17 |
| Check | 04/07/2021 | | Robert J Mueller | Wire transfer | Sweep Account 8487 | | 23,000.00 | 2,098,390.17 |

7:15 PM
08/25/22
Accrual Basis

22-05097-mmp  Doc#1  Filed 12/08/22  Entered 12/08/22 17:09:51  Main Document  Pg 36 of

Policy Services, Inc.

**Transactions by Account**

All Transactions

| Type | Date | Num | Name | Cir | Split | Memo | Amount | Balance |
|------|------|-----|------|-----|-------|------|--------|---------|
| Check | 05/13/2021 | | Robert J Mueller | | Sweep Account 8487 | | 845.00 | 2,099,235.17 |
| Check | 06/14/2021 | | Robert J Mueller | | Sweep Account 8487 | | 674.00 | 2,099,909.17 |
| Check | 07/12/2021 | | Robert J Mueller | | Sweep Account 8487 | | 656.00 | 2,100,565.17 |
| Deposit | 08/04/2021 | | Robert J Mueller | | RFA  3099 | Wire transfer | -2,025.00 | 2,098,540.17 |
| **Total Mueller 548 Transfers** | | | | | | | **175,840.00** | |

# EXHIBIT E-1

3:20 PM
07/25/22
Accrual Basis

22-05097-mmp  Doc#1  Filed 12/08/22  Police Services  12/08/22 17:09:51  Main Document  Pg 38 of
Transactions by Account
45
All Transactions

| | Date | Num | Name | Memo | Split | Amount |
|---|---|---|---|---|---|---|
| Commissions & fees | 06/21/2012 | 100 | Robert J Mueller | | Sweep Account 8487 | 13,047.60 |
| Commissions & fees | 11/09/2012 | 3 | Robert J Mueller | Commission on Mower Anderson | Exchange | 66,000.00 |
| Commissions & fees | 11/29/2012 | 5 | Robert J Mueller | Worley/Toepperwein/Soules/Newsome | -SPLIT- | 176,260.00 |
| Commissions & fees | 12/31/2012 | 7 | Robert J Mueller | Hemani/Soules | Exchange | 40,906.37 |
| Commissions & fees | 02/19/2014 | | Robert J Mueller | For Tran | Corporate Checking 8461 | 25,000.00 |
| Commissions & fees | 02/25/2014 | | Direct Pay | Croy/Diehl | Corporate Checking 8461 | 7,400.00 |
| Commissions & fees | 03/10/2014 | | Direct Pay | Comp on Chiles/2xPlunk/Tran | Corporate Checking 8461 | 1,058.34 |
| Commissions & fees | 03/10/2014 | | Direct Pay | Rob | Corporate Checking 8461 | 12,000.00 |
| Commissions & fees | 03/11/2014 | | Direct Pay | Balance of Chiles/Blair/Plunk/Mueller comps | Corporate Checking 8461 | 15,313.98 |
| Commissions & fees | 03/27/2014 | | Direct Pay | Anderson and Knight | Corporate Checking 8461 | 30,111.46 |
| Commissions & fees | 04/08/2014 | | Robert J Mueller | Paypal transfer to Robt Mueller | Corporate Checking 8461 | 7.00 |
| Commissions & fees | 04/14/2014 | | Direct Pay | Knight and Wolf | Corporate Checking 8461 | 18,157.93 |
| Commissions & fees | 04/15/2014 | | Direct Pay | Brock x 4 | Corporate Checking 8461 | 7,802.67 |
| Commissions & fees | 04/22/2014 | | Direct Pay | Disbursement - Robertdpd by life gift | Corporate Checking 8461 | 12,000.00 |
| Commissions & fees | 04/24/2014 | | Direct Pay | Schreineen and Charles Knight | Corporate Checking 8461 | 21,257.21 |
| Commissions & fees | 05/01/2014 | | Direct Pay | Clinkscales | Corporate Checking 8461 | 4,000.00 |
| Commissions & fees | 05/12/2014 | | Direct Pay | Chiles comp | Corporate Checking 8461 | 7,520.00 |
| Commissions & fees | 05/22/2014 | | Direct Pay | Carr Trust | Corporate Checking 8461 | 6,816.70 |
| Commissions & fees | 05/26/2014 | | Direct Pay | Robert June 2014 | Corporate Checking 8461 | 12,000.00 |
| Commissions & fees | 06/04/2014 | | Direct Pay | Wirth/Elliot Dprt | Corporate Checking 8461 | 11,000.00 |
| Commissions & fees | 07/15/2014 | | Direct Pay | Clinkscales | Corporate Checking 8461 | 9,760.00 |
| Commissions & fees | 07/30/2014 | | Direct Pay | Robert Comp plus Coker | Corporate Checking 8461 | 13,600.00 |
| Commissions & fees | 08/19/2014 | | WF Direct Pay | | Corporate Checking 8461 | 24,550.00 |
| Commissions & fees | 08/21/2014 | | WF Direct Pay | | Corporate Checking 8461 | 15,200.00 |
| Commissions & fees | 08/21/2014 | | WF Direct Pay | | Corporate Checking 8461 | 13,000.00 |
| Commissions & fees | 09/04/2014 | | Direct Pay | | Corporate Checking 8461 | 33,840.88 |
| Commissions & fees | 09/15/2014 | | WF Direct Pay | | Corporate Checking 8461 | 32,224.53 |
| Commissions & fees | 09/15/2014 | | WF Direct Pay | | Corporate Checking 8461 | 9,000.00 |
| Commissions & fees | 10/02/2014 | | Direct Pay | | Corporate Checking 8461 | 7,000.00 |
| Commissions & fees | 10/06/2014 | | Direct Pay | | Corporate Checking 8461 | 18,600.00 |
| Commissions & fees | 10/20/2014 | | Direct Pay | | Corporate Checking 8461 | 5,600.00 |
| Commissions & fees | 11/10/2014 | | Direct Pay | | Corporate Checking 8461 | 8,264.00 |
| Commissions & fees | 11/21/2014 | | Direct Pay | | Corporate Checking 8461 | 7,000.00 |
| Commissions & fees | 11/26/2014 | | Direct Pay | | Corporate Checking 8461 | 15,578.47 |
| Commissions & fees | 12/18/2014 | | Direct Pay | | Corporate Checking 8461 | 3,149.75 |
| Robert J Mueller Total - Policy Services Commissions | | | | | | 704,026.89 |
| | 10/29/2015 | 2316 | Robert J Mueller | | Wells Fargo | 430.00 |
| | 03/09/2016 | | Robert J Mueller | | Wells Fargo | 1,800.00 |
| Robert Mueller - Deeproot Funds | | | | | | 2,230.00 |
| Robert J Mueller Total | | | | | | 706,256.89 |

# EXHIBIT E-2

7:15 PM
08/25/22
Accrual Basis

22-05097-mmp Doc#1 Filed 12/08/22 Entered 12/08/22 17:09:51 Main Document Pg 40 of

**Pelhro Services, Inc**
**Transactions by Account**
All Transactions

**A/R--Robert Mueller**

| Type | Date | Num | Name | Memo | Clr | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|
| Check | 01/20/2015 | | American Express | | | Client Reserve 3081 | 9,207.95 | 9,207.95 |
| Check | 01/30/2015 | | Life Gift Inc. | | | Corporate Checking 8461 | 12,500.00 | 21,707.95 |
| Check | 02/06/2015 | | American Express | | | Client Reserve 3081 | 31,553.31 | 53,261.26 |
| Check | 03/02/2015 | | American Express | | | Client Reserve 3081 | 9,000.00 | 62,261.26 |
| Check | 03/04/2015 | | Robert J Mueller | | | Corporate Checking 8461 | 1,500.00 | 63,761.26 |
| Check | 03/05/2015 | | Robert J Mueller | | | Corporate Checking 8461 | 25,000.00 | 88,761.26 |
| Check | 03/05/2015 | | | Continuation Holdings, Inc | | Corporate Checking 8461 | 12,500.00 | 101,261.26 |
| Check | 03/10/2015 | | American Express | | | Client Reserve 3081 | 107,814.77 | 209,076.03 |
| Check | 03/24/2015 | | American Express | | | Client Reserve 3081 | 20,000.00 | 229,076.03 |
| Check | 04/20/2015 | | Continuation Holdings, Inc | | | Corporate Checking 8461 | 15,750.00 | 244,826.03 |
| Check | 04/23/2015 | | American Express | | | Client Reserve 3081 | 57,315.32 | 302,141.35 |
| Check | 04/29/2015 | | | Continuation Holdings Inc | | Client Reserve 3081 | 12,500.00 | 314,641.35 |
| Check | 05/26/2015 | | American Express | | | Client Reserve 3081 | 30,734.37 | 345,375.72 |
| Check | 06/01/2015 | | | Continuation Holdings | | Corporate Checking 8461 | 12,500.00 | 357,875.72 |
| Check | 06/01/2015 | | Robert J Mueller | | | Corporate Checking 8461 | 50,000.00 | 407,875.72 |
| Check | 06/17/2015 | | American Express | | | Client Reserve 3081 | 8,495.11 | 416,370.83 |
| Check | 07/08/2015 | | American Express | | | Client Reserve 3081 | 8,750.00 | 425,120.83 |
| Check | 07/24/2015 | | USAA | | | Client Reserve 3081 | 105,158.88 | 530,279.71 |
| Check | 08/13/2015 | | American Express | | | Corporate Checking 8461 | 2,000.00 | 532,279.71 |
| Check | 08/14/2015 | | USAA | | | Client Reserve 3081 | 6,307.26 | 538,586.97 |
| Check | 09/16/2015 | | American Express | | | RFA_3099 | -770.00 | 537,816.97 |
| Transfer | 09/24/2015 | | | Funds Transfer | | Client Reserve 3081 | 1,700.35 | 539,517.32 |
| Check | 10/01/2015 | | USAA | | | Corporate Checking 8461 | 300.00 | 539,817.32 |
| Check | 10/22/2015 | | USAA | | | Client Reserve 3081 | 960.00 | 540,777.32 |
| Check | 11/03/2015 | | American Express | | | Client Reserve 3081 | 3,050.82 | 543,828.14 |
| Check | 11/03/2015 | 1167 | Continuation Holdings, Inc | Mueller/Hagan Ownership Transfer Agreement | | Corporate Checking 8461 | 25,000.00 | 568,828.14 |
| Check | 11/03/2015 | | USAA | | | Corporate Checking 8461 | 1,600.00 | 570,428.14 |
| Check | 11/18/2015 | | USAA | | | Corporate Checking 8461 | 5,000.00 | 575,428.14 |
| Check | 11/19/2015 | | USAA | | | Sweep Account 8487 | 440.00 | 575,868.14 |
| Check | 12/01/2015 | | USAA | | | Client Reserve 3081 | 3,000.00 | 578,868.14 |
| General Journal | 12/31/2015 | CFA_15-04 | | | | -SPLIT- | 1,073.00 | 579,941.14 |
| Check | 01/15/2016 | | USAA | | | Sweep Account 8487 | 1,890.00 | 581,831.14 |
| Check | 01/22/2016 | | Paychex | | | RFA_3099 | -3,620.00 | 578,211.14 |
| Check | 01/22/2016 | | Paychex | | | RFA_3099 | 3,620.00 | 581,831.14 |
| Check | 01/25/2016 | | American Express | | | Client Reserve 3081 | 39,145.35 | 620,976.49 |
| Check | 02/09/2016 | | USAA | | | Corporate Checking 8461 | 3,000.00 | 623,976.49 |
| Check | 02/11/2016 | | USAA | | | Corporate Checking 8461 | 200.00 | 624,176.49 |
| Check | 03/09/2016 | | American Express | | | Client Reserve 3081 | 30,000.00 | 654,176.49 |
| Check | 03/15/2016 | | USAA | | | Corporate Checking 8461 | 2,000.00 | 656,176.49 |
| Check | 03/23/2016 | | American Express | | | Client Reserve 3081 | 15,657.83 | 671,834.32 |
| Check | 03/31/2016 | | Paychex | | | RFA_3099 | -1,810.00 | 670,024.32 |
| Check | 03/31/2016 | | Paychex | | | RFA_3099 | 1,810.00 | 671,834.32 |
| Check | 04/14/2016 | | American Express | | | Client Reserve 3081 | 29,378.05 | 701,212.37 |
| Check | 04/29/2016 | | Paychex | | | RFA_3099 | -3,620.00 | 697,592.37 |
| Check | 04/29/2016 | | Paychex | | | RFA_3099 | 3,620.00 | 701,212.37 |
| Check | 05/03/2016 | | American Express | | | Client Reserve 3081 | 53,000.00 | 754,212.37 |
| Check | 06/17/2016 | | American Express | | | Client Reserve 3081 | 5,425.97 | 759,638.34 |
| Check | 06/24/2016 | | American Express | | | Client Reserve 3081 | 25,657.15 | 785,295.49 |
| Check | 07/11/2016 | | American Express | reclass uniforms/Rob | | Client Reserve 3081 | 37,611.63 | 822,907.12 |
| Check | 08/24/2016 | | American Express | | | Client Reserve 3081 | 23,450.95 | 846,358.07 |
| Check | 09/26/2016 | | American Express | | | Client Reserve 3081 | 28,000.00 | 874,358.07 |
| Check | 10/24/2016 | | American Express | | | Client Reserve 3081 | 42,053.32 | 916,411.39 |
| Check | 11/22/2016 | | American Express | | | Client Reserve 3081 | 7,624.74 | 924,036.13 |

7:15 PM
08/25/22
Accrual Basis

22-05097-mmp  Doc#1  Filed 12/08/22  Pg 41 of

**Pelive Services Inc**
12/08/22 17:09:51  Main Document
**Transactions by Account**
All Transactions

| Type | Date | Num | Name | Memo | Clr | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|
| Check | 12/27/2016 | CFA-1540 | American Express | Reclass a/r to Dist as of 12/31/16 | | Client Reserve 3081 | 19,343.43 | 943,379.56 |
| General Journal | 12/31/2016 | | | | | Distributions-RM | 0.00 | 943,379.56 |
| Check | 01/17/2017 | | American Express | | | Client Reserve 3081 | 60,669.79 | 1,004,049.35 |
| Check | 02/21/2017 | | American Express | | | Client Reserve 3081 | 32,159.48 | 1,036,208.83 |
| Check | 03/24/2017 | | American Express | | | Client Reserve 3081 | 27,531.63 | 1,063,740.46 |
| Check | 04/27/2017 | | American Express | | | Client Reserve 3081 | 29,295.17 | 1,093,035.63 |
| Check | 05/24/2017 | | American Express | | | Client Reserve 3081 | 9,501.41 | 1,102,537.04 |
| Check | 06/14/2017 | | American Express | | | Client Reserve 3081 | 8,390.98 | 1,102,928.02 |
| Check | 07/24/2017 | | American Express | | | Client Reserve 3081 | 32,141.55 | 1,135,069.57 |
| Check | 08/24/2017 | | American Express | | | Client Reserve 3081 | 7,841.42 | 1,142,910.99 |
| Check | 09/25/2017 | | American Express | | | Client Reserve 3081 | 8,867.68 | 1,151,778.67 |
| Check | 10/27/2017 | | American Express | | | Client Reserve 3081 | 6,983.92 | 1,158,762.79 |
| Check | 11/22/2017 | | American Express | | | Client Reserve 3081 | 6,000.00 | 1,164,762.79 |
| Check | 12/26/2017 | | American Express | | | Client Reserve 3081 | 37,348.57 | 1,202,111.36 |
| Check | 01/24/2018 | | American Express | | | Client Reserve 3081 | 7,723.77 | 1,209,835.13 |
| Check | 02/21/2018 | | American Express | | | Client Reserve 3081 | 25,133.75 | 1,234,968.88 |
| Check | 03/26/2018 | | American Express | | | Client Reserve 3081 | 24,385.58 | 1,259,354.46 |
| Check | 04/24/2018 | | American Express | | | Client Reserve 3081 | 12,984.10 | 1,272,338.56 |
| Check | 05/23/2018 | | American Express | | | Client Reserve 3081 | 16,442.28 | 1,288,780.84 |
| Check | 06/28/2018 | | American Express | | | Client Reserve 3081 | 15,013.77 | 1,303,794.61 |
| Check | 07/20/2018 | | American Express | | | Client Reserve 3081 | 46,326.25 | 1,350,120.86 |
| Check | 08/27/2018 | | American Express | | | Client Reserve 3081 | 17,616.03 | 1,367,736.89 |
| Check | 09/17/2018 | | American Express | | | Client Reserve 3081 | 96,000.63 | 1,463,737.52 |
| Check | 10/24/2018 | | American Express | | | Client Reserve 3081 | 20,482.20 | 1,484,219.72 |
| Check | 11/26/2018 | | American Express | | | Client Reserve 3081 | 47,535.02 | 1,531,754.74 |
| Check | 12/20/2018 | | American Express | | | Client Reserve 3081 | 45,210.26 | 1,576,965.00 |
| Check | 01/24/2019 | | American Express | | | Client Reserve 3081 | 44,719.31 | 1,591,684.31 |
| Deposit | 02/13/2019 | | Robert J Mueller | Deposit | | Corporate Checking 8461 | -10,000.00 | 1,581,684.31 |
| Check | 02/21/2019 | | American Express | | | Client Reserve 3081 | 20,379.83 | 1,602,064.14 |
| Check | 03/04/2019 | | USAA | | | Corporate Checking 8461 | 1,000.00 | 1,603,064.14 |
| Check | 03/22/2019 | | USAA | | | Corporate Checking 8461 | 1,000.00 | 1,604,064.14 |
| Check | 04/05/2019 | | USAA | | | Corporate Checking 8461 | 2,000.00 | 1,606,064.14 |
| Check | 04/18/2019 | | USAA | | | Corporate Checking 8461 | 600.00 | 1,606,664.14 |
| Check | 04/24/2019 | | USAA | | | Corporate Checking 8461 | 2,000.00 | 1,608,664.14 |
| Check | 04/29/2019 | | USAA | | | Corporate Checking 8461 | 10,000.00 | 1,618,664.14 |
| Check | 04/29/2019 | | USAA | | | Corporate Checking 8461 | 3,000.00 | 1,621,664.14 |
| Check | 05/10/2019 | | USAA | | | Client Reserve 3081 | 2,400.00 | 1,624,064.14 |
| Check | 05/10/2019 | | USAA | | | Client Reserve 3081 | 15,000.00 | 1,639,064.14 |
| Check | 05/22/2019 | 1346 | Robert J Mueller | VOID: | √ | Corporate Checking 8461 | 0.00 | 1,639,064.14 |
| Check | 05/23/2019 | | USAA | | | Sweep Account 8487 | 15,000.00 | 1,654,064.14 |
| Check | 05/28/2019 | | USAA | | | Sweep Account 8487 | 10,000.00 | 1,664,064.14 |
| Check | 06/26/2019 | | USAA | | | Sweep Account 8487 | 15,000.00 | 1,679,064.14 |
| Check | 06/28/2019 | | American Express | | | Client Reserve 3081 | 117,937.63 | 1,797,001.77 |
| Check | 07/01/2019 | | USAA | | | Corporate Checking 8461 | 15,000.00 | 1,812,001.77 |
| Check | 07/03/2019 | | Robert J Mueller | | | Sweep Account 8487 | 31,150.00 | 1,843,151.77 |
| Check | 08/12/2019 | | Chase | | | Client Reserve 3081 | 8,000.00 | 1,851,151.77 |
| Check | 08/20/2019 | | Chase | | | Client Reserve 3081 | 10,000.00 | 1,861,151.77 |
| Check | 08/29/2019 | | Chase | | | Client Reserve 3081 | 9,905.78 | 1,871,057.55 |
| Check | 08/29/2019 | | Chase | | | Client Reserve 3081 | 21,540.20 | 1,892,597.75 |
| Check | 09/12/2019 | | Chase | | | Client Reserve 3081 | 10,169.15 | 1,902,766.90 |
| Check | 09/12/2019 | | Chase | | | Client Reserve 3081 | 19,933.27 | 1,922,700.17 |
| Check | 12/19/2019 | | Chase | | | Client Reserve 3081 | 990.00 | 1,923,690.17 |
| Check | 12/19/2019 | | Chase | | | Client Reserve 3081 | 9,000.00 | 1,932,690.17 |
| Check | 12/31/2019 | | Chase | | | Client Reserve 3081 | 6,000.00 | 1,938,690.17 |

7:15 PM
08/25/22
Accrual Basis

**Pelino Services, Inc.**
**Transactions by Account**
All Transactions

| Type | Date | Num | Name | Memo | Clr | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|
| Check | 01/10/2020 | | Chase | | | Client Reserve 3081 | 12,000.00 | 1,950,690.17 |
| Check | 01/22/2020 | | Chase | | | Client Reserve 3081 | 3,000.00 | 1,953,690.17 |
| Check | 01/27/2020 | | Chase | | | Client Reserve 3081 | 4,000.00 | 1,957,690.17 |
| Check | 01/30/2020 | | USAA | | | Client Reserve 3081 | 3,730.00 | 1,961,420.17 |
| Check | 02/10/2020 | | Chase | | | Client Reserve 3081 | 5,000.00 | 1,966,420.17 |
| Check | 02/12/2020 | | Chase | | | Client Reserve 3081 | 5,000.00 | 1,971,420.17 |
| Check | 02/21/2020 | | Chase | | | Client Reserve 3081 | 5,000.00 | 1,976,420.17 |
| Check | 02/26/2020 | 19 | USAA | | | Client Reserve 3081 | 5,000.00 | 1,981,420.17 |
| Check | 02/27/2020 | | Chase | | | Client Reserve 3081 | 2,500.00 | 1,983,920.17 |
| Check | 02/27/2020 | | USAA | | | Client Reserve 3081 | 2,500.00 | 1,986,420.17 |
| Check | 03/24/2020 | | USAA | | | Client Reserve 3081 | 5,000.00 | 1,991,420.17 |
| Check | 03/25/2020 | | Chase | | | Client Reserve 3081 | 3,000.00 | 1,994,420.17 |
| Check | 03/25/2020 | | Chase | | | Client Reserve 3081 | 4,000.00 | 1,998,420.17 |
| Check | 04/02/2020 | | USAA | | | Client Reserve 3081 | 1,750.00 | 2,000,170.17 |
| Check | 04/29/2020 | | USAA | | | Client Reserve 3081 | 9,000.00 | 2,009,170.17 |
| Check | 04/30/2020 | | Chase | | | Client Reserve 3081 | 5,000.00 | 2,014,170.17 |
| Check | 05/11/2020 | | USAA | | | Client Reserve 3081 | 5,000.00 | 2,019,170.17 |
| Check | 05/20/2020 | | Chase | | | Client Reserve 3081 | 2,000.00 | 2,021,170.17 |
| Check | 05/20/2020 | | Chase | | | Client Reserve 3081 | 7,000.00 | 2,028,170.17 |
| Check | 06/17/2020 | | Chase | | | Client Reserve 3081 | 1,000.00 | 2,029,170.17 |
| Check | 06/17/2020 | | Chase | | | Client Reserve 3081 | 4,000.00 | 2,033,170.17 |
| Check | 08/04/2020 | | USAA | | | Client Reserve 3081 | 4,000.00 | 2,037,170.17 |
| Check | 08/05/2020 | | Chase | | | Client Reserve 3081 | 700.00 | 2,037,870.17 |
| Check | 08/05/2020 | | Chase | | | Client Reserve 3081 | 2,300.00 | 2,040,170.17 |
| Deposit | 08/10/2020 | | | Deposit | | Client Reserve 3081 | 2,000.00 | 2,038,170.17 |
| Deposit | 08/10/2020 | | | Deposit | | Client Reserve 3081 | -5,000.00 | 2,033,170.17 |
| Check | 08/18/2020 | | USAA | | | Sweep Account 8487 | 35,000.00 | 2,069,170.17 |
| Check | 10/13/2020 | | transfer | | | Client Reserve 3081 | 1,500.00 | 2,069,170.17 |
| Deposit | 10/27/2020 | | USAA | Deposit | | Client Reserve 3081 | -48,500.00 | 2,020,670.17 |
| Check | 11/12/2020 | | USAA | | | Client Reserve 3081 | 3,000.00 | 2,017,670.17 |
| Check | 11/19/2020 | | Chase | | | Client Reserve 3081 | 2,200.00 | 2,019,870.17 |
| Check | 11/30/2020 | | USAA | | | Client Reserve 3081 | 10,000.00 | 2,029,870.17 |
| Check | 12/15/2020 | | USAA | | | Client Reserve 3081 | 5,000.00 | 2,034,870.17 |
| Check | 01/04/2021 | | Chase | | | Client Reserve 3081 | 200.00 | 2,035,070.17 |
| Check | 01/04/2021 | | Chase | | | Client Reserve 3081 | 820.00 | 2,035,890.17 |
| Check | 01/08/2021 | | Robert J Mueller | | | Sweep Account 8487 | 48,500.00 | 2,084,390.17 |
| Check | 01/12/2021 | | Chase | | | Client Reserve 3081 | 1,000.00 | 2,085,390.17 |
| Check | 01/12/2021 | | Chase | | | Client Reserve 3081 | 10,000.00 | 2,095,390.17 |
| Deposit | 01/20/2021 | | Robert J Mueller | Wire transfer | | Client Reserve 3081 | 20,000.00 | 2,075,390.17 |
| Check | 04/07/2021 | | Robert J Mueller | Wire transfer | | Sweep Account 8487 | 23,000.00 | 2,098,390.17 |
| Check | 05/13/2021 | | Robert J Mueller | | | Sweep Account 8487 | 845.00 | 2,099,235.17 |
| Check | 06/14/2021 | | Robert J Mueller | | | Sweep Account 8487 | 674.00 | 2,099,909.17 |
| Check | 07/12/2021 | | Robert J Mueller | | | Sweep Account 8487 | 656.00 | 2,100,565.17 |
| Deposit | 08/04/2021 | | Robert J Mueller | Wire transfer | | RFA 3099 | -2,025.00 | 2,098,540.17 |

1 yr pref

2,098,540.17

**Total A/R--Robert Mueller**      **2,098,540.17**    **2,098,540.17**

# EXHIBIT F

7:15 PM
08/25/22
Accrual Basis

**Transactions by Account**
All Transactions

| Type | Date | Num | Name | Memo | Clr | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|
| Check | 12/26/2017 | | American Express | | | Client Reserve 3081 | 37,348.57 | 1,202,111.36 |
| Check | 01/24/2018 | | American Express | | | Client Reserve 3081 | 7,723.77 | 1,209,835.13 |
| Check | 02/21/2018 | | American Express | | | Client Reserve 3081 | 25,133.75 | 1,234,968.88 |
| Check | 03/26/2018 | | American Express | | | Client Reserve 3081 | 24,385.58 | 1,259,354.46 |
| Check | 04/24/2018 | | American Express | | | Client Reserve 3081 | 12,984.10 | 1,272,338.56 |
| Check | 05/23/2018 | | American Express | | | Client Reserve 3081 | 16,442.28 | 1,288,780.84 |
| Check | 06/28/2018 | | American Express | | | Client Reserve 3081 | 15,013.77 | 1,303,794.61 |
| Check | 07/20/2018 | | American Express | | | Client Reserve 3081 | 46,326.25 | 1,350,120.86 |
| Check | 08/27/2018 | | American Express | | | Client Reserve 3081 | 17,616.03 | 1,367,736.89 |
| Check | 09/17/2018 | | American Express | | | Client Reserve 3081 | 96,000.63 | 1,463,737.52 |
| Check | 10/24/2018 | | American Express | | | Client Reserve 3081 | 20,482.20 | 1,484,219.72 |
| Check | 11/26/2018 | | American Express | | | Client Reserve 3081 | 17,535.02 | 1,501,754.74 |
| Check | 12/24/2018 | | American Express | | | Client Reserve 3081 | 45,210.26 | 1,546,965.00 |
| Check | 01/24/2019 | | American Express | | | Client Reserve 3081 | 44,719.31 | 1,591,684.31 |
| Deposit | 02/13/2019 | | Robert J Mueller | Deposit | | Corporate Checking 8461 | -10,000.00 | 1,581,684.31 |
| Check | 02/21/2019 | | American Express | | | Client Reserve 3081 | 20,379.83 | 1,602,064.14 |
| Check | 03/21/2019 | | USAA | | | Corporate Checking 8461 | 1,000.00 | 1,603,064.14 |
| Check | 03/22/2019 | | USAA | | | Corporate Checking 8461 | 1,000.00 | 1,604,064.14 |
| Check | 04/05/2019 | | USAA | | | Corporate Checking 8461 | 2,000.00 | 1,606,064.14 |
| Check | 04/18/2019 | | USAA | | | Corporate Checking 8461 | 600.00 | 1,606,664.14 |
| Check | 04/24/2019 | | USAA | | | Corporate Checking 8461 | 2,000.00 | 1,608,664.14 |
| Check | 04/29/2019 | | USAA | | | Corporate Checking 8461 | 10,000.00 | 1,618,664.14 |
| Check | 04/29/2019 | | USAA | | | Corporate Checking 8461 | 3,000.00 | 1,621,664.14 |
| Check | 05/10/2019 | | USAA | | | Client Reserve 3081 | 2,400.00 | 1,624,064.14 |
| Check | 05/10/2019 | | USAA | | | Client Reserve 3081 | 15,000.00 | 1,639,064.14 |
| Check | 05/22/2019 | 1346 | Robert J Mueller | VOID: | √ | Corporate Checking 8461 | 0.00 | 1,639,064.14 |
| Check | 05/23/2019 | | USAA | | | Sweep Account 8487 | 15,000.00 | 1,654,064.14 |
| Check | 05/28/2019 | | USAA | | | Sweep Account 8487 | 10,000.00 | 1,664,064.14 |
| Check | 06/26/2019 | | USAA | | | Sweep Account 8487 | 15,000.00 | 1,679,064.14 |
| Check | 06/28/2019 | | American Express | | | Client Reserve 3081 | 117,937.63 | 1,797,001.77 |
| Check | 07/01/2019 | | USAA | | | Corporate Checking 8461 | 15,000.00 | 1,812,001.77 |
| Check | 07/03/2019 | | Robert J Mueller | | | Sweep Account 8487 | 31,150.00 | 1,843,151.77 |
| Check | 08/12/2019 | | Chase | | | Client Reserve 3081 | 8,000.00 | 1,851,151.77 |
| Check | 08/20/2019 | | Chase | | | Client Reserve 3081 | 10,000.00 | 1,861,151.77 |
| Check | 08/29/2019 | | Chase | | | Client Reserve 3081 | 9,905.78 | 1,871,057.55 |
| Check | 08/29/2019 | | Chase | | | Client Reserve 3081 | 21,540.20 | 1,892,597.75 |
| Check | 09/12/2019 | | Chase | | | Client Reserve 3081 | 10,169.15 | 1,902,766.90 |
| Check | 09/12/2019 | | Chase | | | Client Reserve 3081 | 19,933.27 | 1,922,700.17 |
| Check | 12/19/2019 | | Chase | | | Client Reserve 3081 | 990.00 | 1,923,690.17 |
| Check | 12/19/2019 | | Chase | | | Client Reserve 3081 | 9,000.00 | 1,932,690.17 |
| Check | 12/31/2019 | | Chase | | | Client Reserve 3081 | 6,000.00 | 1,938,690.17 |
| Check | 01/10/2020 | | Chase | | | Client Reserve 3081 | 12,000.00 | 1,950,690.17 |
| Check | 01/27/2020 | | Chase | | | Client Reserve 3081 | 3,000.00 | 1,953,690.17 |

7:15 PM
08/25/22
Accrual Basis

22-05097-mmp  Doc#1  Filed 12/08/2...  Policy Services...  17:09:51  Main Document  Pg 45 of

**Transactions by Account**
All Transactions

| Type | Date | Num | Name | Memo | Clr | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|
| Check | 01/27/2020 | | Chase | | | Client Reserve 3081 | 4,000.00 | 1,957,690.17 |
| Check | 01/30/2020 | | USAA | | | Client Reserve 3081 | 3,730.00 | 1,961,420.17 |
| Check | 02/10/2020 | | Chase | | | Client Reserve 3081 | 5,000.00 | 1,966,420.17 |
| Check | 02/12/2020 | | Chase | | | Client Reserve 3081 | 5,000.00 | 1,971,420.17 |
| Check | 02/21/2020 | | Chase | | | Client Reserve 3081 | 5,000.00 | 1,976,420.17 |
| Check | 02/26/2020 | 19 | USAA | | | Client Reserve 3081 | 5,000.00 | 1,981,420.17 |
| Check | 02/27/2020 | | Chase | | | Client Reserve 3081 | 2,500.00 | 1,983,920.17 |
| Check | 02/27/2020 | | Chase | | | Client Reserve 3081 | 2,500.00 | 1,986,420.17 |
| Check | 03/24/2020 | | USAA | | | Client Reserve 3081 | 5,000.00 | 1,991,420.17 |
| Check | 03/25/2020 | | Chase | | | Client Reserve 3081 | 3,000.00 | 1,994,420.17 |
| Check | 03/25/2020 | | Chase | | | Client Reserve 3081 | 4,000.00 | 1,998,420.17 |
| Check | 04/02/2020 | | USAA | | | Client Reserve 3081 | 1,750.00 | 2,000,170.17 |
| Check | 04/29/2020 | | USAA | | | Client Reserve 3081 | 9,000.00 | 2,009,170.17 |
| Check | 04/30/2020 | | Chase | | | Client Reserve 3081 | 5,000.00 | 2,014,170.17 |
| Check | 05/11/2020 | | USAA | | | Client Reserve 3081 | 5,000.00 | 2,019,170.17 |
| Check | 05/20/2020 | | Chase | | | Client Reserve 3081 | 2,000.00 | 2,021,170.17 |
| Check | 05/20/2020 | | Chase | | | Client Reserve 3081 | 7,000.00 | 2,028,170.17 |
| Check | 06/17/2020 | | Chase | | | Client Reserve 3081 | 1,000.00 | 2,029,170.17 |
| Check | 06/17/2020 | | Chase | | | Client Reserve 3081 | 4,000.00 | 2,033,170.17 |
| Check | 08/04/2020 | | USAA | | | Client Reserve 3081 | 4,000.00 | 2,037,170.17 |
| Check | 08/05/2020 | | Chase | | | Client Reserve 3081 | 700.00 | 2,037,870.17 |
| Check | 08/05/2020 | | Chase | | | Client Reserve 3081 | 2,300.00 | 2,040,170.17 |
| Deposit | 08/10/2020 | | | Deposit | | Client Reserve 3081 | -2,000.00 | 2,038,170.17 |
| Deposit | 08/10/2020 | | | Deposit | | Client Reserve 3081 | -5,500.00 | 2,032,670.17 |
| Check | 08/18/2020 | | USAA | | | Sweep Account 8487 | 35,000.00 | 2,067,670.17 |
| Check | 10/13/2020 | | transfer | | | Client Reserve 3081 | 1,500.00 | 2,069,170.17 |
| Deposit | 10/27/2020 | | USAA | Deposit | | Client Reserve 3081 | -48,500.00 | 2,020,670.17 |
| Deposit | 11/12/2020 | | USAA | Deposit | | Client Reserve 3081 | -3,000.00 | 2,017,670.17 |
| Check | 11/19/2020 | | Chase | | | Client Reserve 3081 | 2,200.00 | 2,019,870.17 |
| Check | 11/30/2020 | | USAA | | | Client Reserve 3081 | 10,000.00 | 2,029,870.17 |
| Check | 12/15/2020 | | USAA | | | Client Reserve 3081 | 5,000.00 | 2,034,870.17 |
| Check | 01/04/2021 | | Chase | | | Client Reserve 3081 | 200.00 | 2,035,070.17 |
| Check | 01/04/2021 | | Chase | | | Client Reserve 3081 | 820.00 | 2,035,890.17 |
| Check | 01/08/2021 | | Robert J Mueller | | | Sweep Account 8487 | 48,500.00 | 2,084,390.17 |
| Check | 01/12/2021 | | Chase | | | Client Reserve 3081 | 1,000.00 | 2,085,390.17 |
| Check | 01/12/2021 | | Chase | | | Client Reserve 3081 | 10,000.00 | 2,095,390.17 |
| Deposit | 01/20/2021 | | Robert J Mueller | Wire transfer | | Client Reserve 3081 | -20,000.00 | 2,075,390.17 |
| Check | 04/07/2021 | | Robert J Mueller | Wire transfer | | Sweep Account 8487 | 23,000.00 | 2,098,390.17 |
| Check | 05/13/2021 | | Robert J Mueller | | | Sweep Account 8487 | 845.00 | 2,099,235.17 |
| Check | 06/14/2021 | | Robert J Mueller | | | Sweep Account 8487 | 674.00 | 2,099,909.17 |
| Check | 07/12/2021 | | Robert J Mueller | | | Sweep Account 8487 | 656.00 | 2,100,565.17 |
| Deposit | 08/04/2021 | | Robert J Mueller | Wire transfer | | RFA 3099 | -2,025.00 | 2,098,540.17 |

**Total Mueller 544 CF Transfers** 933,777.38

# EXHIBIT G

22-05097-mmp  Doc#1  Filed 12/08/22  Entered 12/08/22 17:09:51  Main Document   Pg 47 of

Policy Services

**Transactions by Account**

All Transactions

| Type | Date | Num | Name | Memo | Clr | Split | Amount | Balance |
|------|------|-----|------|------|-----|-------|--------|---------|
| Check | 12/15/2020 | | USAA | | | Client Reserve 3081 | 5,000.00 | 2,034,870.17 |
| Check | 01/04/2021 | | Chase | | | Client Reserve 3081 | 200.00 | 2,035,070.17 |
| Check | 01/04/2021 | | Chase | | | Client Reserve 3081 | 820.00 | 2,035,890.17 |
| Check | 01/08/2021 | | Robert J Mueller | | | Sweep Account 8487 | 48,500.00 | 2,084,390.17 |
| Check | 01/12/2021 | | Chase | | | Client Reserve 3081 | 1,000.00 | 2,085,390.17 |
| Check | 01/12/2021 | | Chase | | | Client Reserve 3081 | 10,000.00 | 2,095,390.17 |
| Deposit | 01/20/2021 | | Robert J Mueller | Wire transfer | | Client Reserve 3081 | -20,000.00 | 2,075,390.17 |
| Check | 04/07/2021 | | Robert J Mueller | Wire transfer | | Sweep Account 8487 | 23,000.00 | 2,098,390.17 |
| Check | 05/13/2021 | | Robert J Mueller | | | Sweep Account 8487 | 845.00 | 2,099,235.17 |
| Check | 06/14/2021 | | Robert J Mueller | | | Sweep Account 8487 | 674.00 | 2,099,909.17 |
| Check | 07/12/2021 | | Robert J Mueller | | | Sweep Account 8487 | 656.00 | 2,100,565.17 |
| Deposit | 08/04/2021 | | Robert J Mueller | Wire transfer | | RFA_3099 | -2,025.00 | 2,098,540.17 |

**Total Mueller 547 Transfers** | | | | | | | 68,670.00 |

**FORM 104 (10/06)**

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| **PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| John Patrick Lowe, Chapter 7 Trustee | Pamela Hopman, PGH Advisors, LLC, et al. |

| **ATTORNEYS** (Firm Name, Address, and Telephone No.) Pulman Cappuccio & Pullen, LLP (210) 222-9494 2161 NW Military Hwy #400, San Antonio, TX 78213 | **ATTORNEYS** (If Known) |
|---|---|

| **PARTY** (Check One Box Only) | **PARTY** (Check One Box Only) |
|---|---|
| □ Debtor   □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor   □ Other<br>☑ Trustee | □ Debtor   □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor   ☑ Other<br>□ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Trustee seeks recovery of fraudulent transfers under 11 USC Sections 544, 548, 550, TUFTA and seeks recovery of attorneys' fees.

## NATURE OF SUIT
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- ☐ 11-Recovery of money/property - §542 turnover of property
- ☑ 3 12-Recovery of money/property - §547 preference
- ☑ 2 13-Recovery of money/property - §548 fraudulent transfer
- ☑ 1 14-Recovery of money/property - other - Section 544
  Section 550

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- ☐ 71-Injunctive relief – reinstatement of stay
- ☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- ☑ 4 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- ☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- ☐ 01-Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
- ☑ 5 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case) - TUFTA / Breach of fiduciary duty

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $   72,000,000.00 |

Other Relief Sought   Attorneys' fees

**FORM 104 (10/06), Page 2**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>deeproot Capital Management LLC et al. (JT. Admin.) | | BANKRUPTCY CASE NO.<br>LEAD 21-51523 |
| DISTRICT IN WHICH CASE IS PENDING<br>Western TX | DIVISIONAL OFFICE<br>San Antonio | NAME OF JUDGE<br>Michael M Parker |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISIONAL OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>12/08/2022 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Randall A Pulman | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, if it is required by the court. In some courts, the cover sheet is not required when the adversary proceeding is filed electronically through the court's Case Management/Electronic Case Files (CM/ECF) system. (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and the defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and in the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.